-----Original Message-----
From: FIX@SOUTHPORTMARITIME.COM [mailto:FIX@SOUTHPORTMARITIME.COM]
Sent: Friday, December 11, 2009 12:10 PM
To: George Rozanovich - Eitzen Chemical US
Subject: FINAL RECAP 'GLEN' OOS / CARIB PETROLEUM

TO..: EITZEN
ATTN: George Rozanovich
FROM: Southport Maritime Inc.
DATE: 11-DEC-2009 12:09
MSG.: 780322


Attached File:
"C:\DOCUME~1\mike\LOCALS~1\Temp\ForwardingFiles\Glen_Questionnaire
88.pdf"  11-Dec-2009 07:06:32   175,497 Bytes.


------- Recipients: ----------
TO: CARIB PETROLEUM INC. // CARLOS GAMBOA
TO: EITZEN // George Rozanovich
TO: EITZEN // CHARTERING
-----------------------------------

 This is Southport Maritime Inc. - December 11, 2009

To : Carib Petroleum - Carlos Gamboa
To : Eitzen USA - George Rozanovich

Re : MT 'Glen' OOS/ Carib Petroleum

Private and Confidential
------------------------

We are pleased to recap herebelow terms and conditions of fixture
account Carib Petroleum, as follows :

Vessel       : MT 'Glen' (q88 attached)

* Owners option for similar substitute always to be approved by all
Parties
  with approval not to be unreasonable withheld

for

Cargo        : Charterers option upto full cargo
               Distillates - max 2 grades wvns
               intended cargo is about 5,000 MT of Tecsol (Diesel
without
               aromatics API abt 33)



EXHIBIT
1

FW: FINAL RECAP 'GLEN' OOS / CARIB PETROLEUM

```
Load          : 1 SP Puerto Cabello (Venezuela)

Discharge     : 1 SP Barahona (Dominican Republic) or
                1 SP Cristobal (Atlantic Panama)

Laydays       : December 13, 1200 hours - December 14, 2009
                Glen is ETD Barranquilla Dec. 11 am
                Eta P.Cabello Dec 12 @ 1700 agw

Freight       : Lump Sum USD 130,000 basis 1 Load/1 Disport Barahona
                Lump Sum USD 165,000 basis 1 Load/1 Disport Cristobal
                Payment before breaking bulk

Demurrage     : USD 10,000 pdpr

Laytime       : 72 hrs total

- Asbatankvoy C/P form
- Charterers agents at load/disport provided competitive fees
  At load Betelgeuse
  AGENTES NAVIEROS Y ADUANALES PUERTO CABELLO - LA GUAIRA - MARACAIBO
  VENEZUELA
  Tel: 58-242-3612690 - 3619091
  Fax: 58-242-3617456
  Email: betelgeusepcb@cantv.net
  Conatct : Carlos Morales
  At disport Dominican Republic, Ageport
  At disport Panama, to be named
- Worldscale Hours,Terms,Conditions

2.5 pct brokerage commission on freight/demurrage due by Owners to
Southport Maritime Inc.
No address commission

End recap

Regards,
Southport Maritime Inc.
as brokers only
```

```
------------------------------------------------------------------
--
Southport Maritime Inc. as brokers only.
```

| | Content-Description: Glen_Questionnaire 88.pdf |
|---|---|
| **Glen_Questionnaire 88.pdf** | **Content-Type:** application/octet-stream |
| | **Content-Encoding:** base64 |

INTERTANKO'S STANDARD TANKER CHARTERING QUESTIONNAIRE 88 (Q88)                                    Version 3

| 1. | VESSEL DESCRIPTION | | | |
|------|------|------|------|------|
| 1.1 | Date updated: | | Dec 10, 2009 | |
| 1.2 | Vessel's name: | | Glen | |
| 1.3 | IMO number: | | 9311634 | |
| 1.4 | Vessel's previous name(s) and date(s) of change: | | Liquied Beauty (Sep 27, 2007)Brovig Fiord (Jan 13, 2006)Songa Pearl (Dec 05, 2005) | |
| 1.5 | Date delivered: | | Dec 05, 2005 | |
| 1.6 | Builder (where built): | | Samho Shipbuilding | |
| 1.7 | Flag: | | Singapore | |
| 1.8 | Port of Registry: | | Singapore | |
| 1.9 | Call sign: | | 9VJQ5 | |
| 1.10 | Vessel's satcom phone number: | | 764805949 | |
| | Vessel's fax number: | | 764805955 | |
| | Vessel's telex number: | | 456563010/11 | |
| | Vessel's email address: | | glen@super-hub.com | |
| 1.11 | Type of vessel: | | Chemical /Oil Tanker | |
| 1.12 | Type of hull: | | Double Hull | |
| **Classification** | | | | |
| 1.13 | Classification society: | | Germanischer Lloyd | |
| 1.14 | Class notation: | | CHEMICAL TANKER TYPE 2, OIL TANKER WITH DOUBLE HULL MACHINERY MC | |
| 1.15 | If Classification society changed, name of previous society: | | DNV | |
| 1.16 | If Classification society changed, date of change: | | Mar 08, 2008 | |
| 1.17 | IMO type, if applicable: | | | |
| 1.18 | Does the vessel have ice class? If yes, state what level: | | , 1A1 Tanker for Oil and Chemicals | |
| 1.19 | Date / place of last dry-dock: | | Not Applicable | |
| 1.20 | Date next dry dock due | | Dec 05, 2010 | |
| 1.21 | Date of last special survey / next survey due: | | Not Applicable | Dec 05, 2010 |
| 1.22 | Date of last annual survey: | | | |
| 1.23 | If ship has Condition Assessment Program (CAP), what is the latest overall rating: | | 0 | |
| 1.24 | Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS): If yes, what is the expiry date? | | N/A | |
| **Dimensions** | | | | |
| 1.25 | Length Over All (LOA): | | | 127.2 Metres |
| 1.26 | Length Between Perpendiculars (LBP): | | | 119 Metres |
| 1.27 | Extreme breadth (Beam): | | | 20.43 Metres |
| 1.28 | Moulded depth: | | | 11.5 Metres |
| 1.29 | Keel to Masthead (KTM) / KTM in collapsed condition (if applicable): | | 38.1 Metres | Metres |
| 1.30 | Bow to Center Manifold (BCM) / Stern to Center Manifold (SCM): | | 59.6 Metres | 67.6 Metres |
| 1.31 | Distance bridge front to center of manifold: | | | 41.15 Metres |
| 1.32 | Parallel body distances: | Lightship | Normal Ballast | Summer Dwt |
| | Forward to mid-point manifold: | 22 Metres | 22.5 Metres | 30.3 Metres |
| | Aft to mid-point manifold: | 35.8 Metres | 38.3 Metres | 41.5 Metres |
| | Parallel body length: | 67.8 Metres | 61.8 Metres | 71.8 Metres |
| 1.33 | FWA at summer draft / TPC immersion at summer draft: | | 188 Millimetres | 22.93 Metric Tonnes |
| 1.34 | What is the max height of mast above waterline (air draft) | | Full Mast | Collapsed Mast |
| | Lightship: | | 35.626 Metres | 0.0 Metres |
| | Normal ballast: | | 32.368 Metres | 0.0 Metres |
| | At loaded summer deadweight: | | 29.386 Metres | 0.0 Metres |
| **Tonnages** | | | | |
| 1.35 | Net Tonnage: | | 4,030 | |
| 1.36 | Gross Tonnage / Reduced Gross Tonnage (if applicable): | | 8,450 | |
| 1.37 | Suez Canal Tonnage - Gross (SCGT) / Net (SCNT): | | | |

| 1.38 | Panama Canal Net Tonnage (PCNT): | | | | |
|---|---|---|---|---|---|

**Loadline Information**

| 1.39 | Loadline | Freeboard | Draft | Deadweight | Displacement |
|---|---|---|---|---|---|
| | Summer: | 2.812 Metres | 8.714 Metres | 12,956 Metric Tonnes | 17,232 Metric Tonnes |
| | Winter: | 2.993 Metres | 8.533 Metres | 12,515 Metric Tonnes | 16,791 Metric Tonnes |
| | Tropical: | 2.631 Metres | 8.895 Metres | 13,345 Metric Tonnes | 17,620 Metric Tonnes |
| | Lightship: | 9.052 Metres | 2.474 Metres | | 4,276 Metric Tonnes |
| | Normal Ballast Condition: | 5.794 Metres | 5.732 Metres | 6,414 Metric Tonnes | 10,690 Metric Tonnes |
| 1.40 | Does vessel have multiple SDWT? | | | No | |
| 1.41 | If yes, what is the maximum assigned deadweight? | | | | Metric Tonnes |

**Ownership and Operation**

| 1.42 | Registered owner - Full style: | OPEN WATERS GLEN PTE LTD C/O NAVIN & CO. LLP ADVOCATES & SOLICITORS,1 MARITIME SQUARE #09-07/14 HARBOURFRONT CENTRE SINGAPORE 099253 Tel: +357 25843100 Fax: 357 25320325 Telex: 0605 3205/3206 Email: SHIPMANAGEMENT@CSMCY.COM |
|---|---|---|
| 1.43 | Technical operator - Full style: | Columbia Shipmanagement ltd COLUMBIA HOUSE, DODEKANISON STR. 4043 LIMASSOL CYPRUS Tel: 357 25843100 Fax: 357 25320325 Telex: 0605 3205/3206 Email: SHIPMANAGEMENT@CSMCY.COM |
| 1.44 | Commercial operator - Full style: | Eitzen Chemical A.S. CAMILO EITZEN HOUSE, 8 SMAKKEDALEN, DK-2820, GENTOFT, DENMARK Tel: 45 77338610 Fax: 45 77338620 Telex: Not Applicable Email: oprcph@eitzen-chemical.com |
| 1.45 | Disponent owner - Full style: | n/a |

| 2. | CERTIFICATION | Issued | Last Annual or Intermediate | Expires |
|---|---|---|---|---|
| 2.1 | Safety Equipment Certificate: | Oct 15, 2008 | Not Applicable | Dec 08, 2010 |
| 2.2 | Safety Radio Certificate: | Apr 24, 2008 | Not Applicable | Dec 08, 2010 |
| 2.3 | Safety Construction Certificate: | Apr 24, 2008 | Not Applicable | Dec 08, 2010 |
| 2.4 | Loadline Certificate: | Nov 25, 2008 | Not Applicable | Dec 08, 2010 |
| 2.5 | International Oil Pollution Prevention Certificate (IOPPC): | Nov 25, 2008 | Not Applicable | Dec 08, 2010 |
| 2.6 | Safety Management Certificate (SMC): | Jan 30, 2008 | Not Applicable | Jan 20, 2013 |
| 2.7 | Document of Compliance (DOC): | Jan 19, 2006 | Nov 27, 2008 | Nov 07, 2010 |
| 2.8 | USCG (specify: COC, LOC or COI): COC | | | May 06, 2010 |
| 2.9 | Civil Liability Convention Certificate (CLC): | Feb 20, 2009 | | Feb 20, 2010 |
| 2.10 | Civil Liability for Bunker Oil Pollution Damage Convention Certificate (CLBC): | | | Feb 20, 2010 |
| 2.11 | U.S. Certificate of Financial Responsibility (COFR): | Sep 21, 2007 | | Sep 21, 2010 |
| 2.12 | Certificate of Fitness (Chemicals): | May 28, 2008 | | Dec 08, 2010 |
| 2.13 | Certificate of Fitness (Gas): | Not Applicable | | Not Applicable |
| 2.14 | Certificate of Class: | | | Dec 08, 2010 |

| 2.15 | International Ship Security Certificate (ISSC): | Jan 29, 2008 | | Jan 20, 2013 |
|---|---|---|---|---|
| 2.16 | International Sewage Pollution Prevention Certificate (ISPPC) | | | |
| 2.17 | International Air Pollution Prevention Certificate (IAPP): | Apr 03, 2008 | | Dec 08, 2010 |
| **Documentation** | | | | |
| 2.18 | Does vessel have all updated publications as listed in the Vessel Inspection Questionnaire, Chapter 2- Question 2.24, as applicable: | | Yes | |
| 2.19 | Owner warrant that vessel is member of ITOPF and will remain so for the entire duration of this voyage/contract: | | Yes | |

| 3. | **CREW MANAGEMENT** | |
|---|---|---|
| 3.1 | Nationality of Master: | Russia |
| 3.2 | Nationality of Officers: | Georgian, Latvian, Ukrainian, Filipino |
| 3.3 | Nationality of Crew: | Filipino |
| 3.4 | If Officers/Crew employed by a Manning Agency - Full style: | Officers:<br>Columbia Shipmanagement ltd<br>COLUMBIA HOUSE, DODEKANISON STR. 4043, LIMASSOL, P.O.BOX 51624, 3507 LIMASSOL, CYPRUS<br>Tel: 357 25843100<br>Fax: 357 2530325<br>Telex: 0605 3205/3206<br>Email: SHIPMANAGEMENT@CSMCY.COM<br>Crew:<br>COLUMNIA SHIPMANAGEMENT LTD<br>COLUMBIA HOUSE, DODEKANISON STR., P.O.BOX 51624, 3507 LIMASSOL, CYPRUS<br>Tel: 357 258 43100<br>Fax: 357 2530325<br>Telex: 0605 3205/3206<br>Email: SHIPMANAGEMENT@CSMCY.COM |
| 3.5 | What is the common working language onboard: | English |
| 3.6 | Do officers speak and understand English: | Yes |
| 3.7 | In case of Flag Of Convenience, is the ITF Special Agreement on board: | Yes |

| 4. | **HELICOPTERS** | |
|---|---|---|
| 4.1 | Can the ship comply with the ICS Helicopter Guidelines: | N/A |
| 4.2 | If Yes, state whether winching or landing area provided: | |

| 5. | **FOR USA CALLS** | |
|---|---|---|
| 5.1 | Has the vessel Operator submitted a Vessel Spill Response Plan to the US Coast Guard which has been approved by official USCG letter: | Yes |
| 5.2 | Qualified individual (QI) - Full style: | O'Brien<br>186 Princeton-Hightstown Road, Bldg. 3-B, West Windsor, NJ 08550-1668, USA<br>Tel: +609 275 9600<br>Fax: 1-985-781-0580<br>Telex· 49617361 OOPS UI<br>Email· commandcenter@oopsusa.com |
| 5.3 | Oil Spill Response Organization (OSRO) -Full style: | National Response Corp<br>3500 Sunrise Highway , Suite T-103 Great River , NY 11739<br>Tel. +1 800 899 4672<br>Fax: +1 631 224 9086 |
| 5.4 | Has technical operator signed the SCIA / C-TPAT agreement with US customs concerning drug smuggling: | Yes |

| 6. | **CARGO AND BALLAST HANDLING** | |
|---|---|---|
| **Double Hull Vessels** | | |
| 6.1 | Is vessel fitted with centerline bulkhead in all cargo tanks: | No |
| 6.2 | If Yes, is bulkhead solid or perforated: | |

**Cargo Tank Capacities**

| | | |
|---|---|---|
| 6.3 | Capacity (98%) of each natural segregation with double valve (specify tanks): | |
| 6.4 | Total cubic capacity (98%, excluding slop tanks): | 13,073.7 Cu. Metres |
| 6.5 | Slop tank(s) capacity (98%): | 698.8 Cu. Metres |
| 6.6 | Residual/Retention oil tank(s) capacity (98%), if applicable: | Cu. Metres |
| 6.7 | Does vessel have Segregated Ballast Tanks (SBT) or Clean Ballast Tanks (CBT)? | SBT |

**SBT Vessels**

| | | |
|---|---|---|
| 6.8 | What is total capacity of SBT? | 5,213.8 Cu. Metres |
| 6.9 | What percentage of SDWT can vessel maintain with SBT only: | 41 |
| 6.10 | Does vessel meet the requirements of MARPOL Annex I Reg 18.2: (previously Reg 13.2) | Yes |

**Cargo Handling**

| | | |
|---|---|---|
| 6.11 | How many grades/products can vessel load/discharge with double valve segregation: | 13 |
| 6.12 | Maximum loading rate for homogenous cargo per manifold connection: | 1,000 Cu. Metres/Hour |
| 6.13 | Maximum loading rate for homogenous cargo loaded simultaneously through all manifolds: | 1,200 Cu. Metres/Hour |
| 6.14 | Are there any cargo tank filling restrictions. If yes, please specify: | Yes<br>80% if specific gravity 1.80 |

**Pumping Systems**

| 6.15 | Pumps: | No. | Type | Capacity |
|---|---|---|---|---|
| | Cargo: | 1221 | CentrifugalCentrifugal Centrifugal | 300 M3/HR100 M3/HR70 M3/HR |
| | Stripping: | | | Cu. Metres/Hour |
| | Eductors: | | | Cu. Metres/Hour |
| | Ballast: | 2 | Centrifugal | 350 Cu. Metres/Hour |
| 6.16 | How many cargo pumps can be run simultaneously at full capacity: | | | |

**Cargo Control Room**

| | | |
|---|---|---|
| 6.17 | Is ship fitted with a Cargo Control Room (CCR): | Yes |
| 6.18 | Can tank innage / ullage be read from the CCR: | Yes |

**Gauging and Sampling**

| | | |
|---|---|---|
| 6.19 | Can ship operate under closed conditions in accordance with ISGOTT: | Yes |
| 6.20 | What type of fixed closed tank gauging system is fitted: | Floating |
| 6.21 | Are overfill (high-high) alarms fitted? If Yes, indicate whether to all tanks or partial: | |

**Vapor Emission Control**

| | | |
|---|---|---|
| 6.22 | Is a vapor return system (VRS) fitted: | Yes |
| 6.23 | Number/size of VRS manifolds (per side): | 150 Millimetres |

**Venting**

| | | |
|---|---|---|
| 6.24 | State what type of venting system is fitted: | High Velocity P/V Valves |

**Cargo Manifolds**

| | | |
|---|---|---|
| 6.25 | Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment': | Yes |
| 6.26 | What is the number of cargo connections per side: | 14 |
| 6.27 | What is the size of cargo connections: | 300 |
| 6.28 | What is the material of the manifold: | Stainless Steel |

**Manifold Arrangement**

| | | |
|---|---|---|
| 6.29 | Distance between cargo manifold centers: | 450 Millimetres |
| 6.30 | Distance ships rail to manifold: | 3,960 Millimetres |
| 6.31 | Distance manifold to ships side: | 4,000 Millimetres |
| 6.32 | Top of rail to center of manifold: | 1,140 Millimetres |
| 6.33 | Distance main deck to center of manifold: | 2,720 Millimetres |
| 6.34 | Manifold height above the waterline in normal ballast / at SDWT condition: | 9.2 Metres | 5.5 Metres |
| 6.35 | Number / size reducers: | 2 x 300/150mm (12/6") |

| | | 2 x 150/100mm (6/4") 2 x 300/200mm (12/8") 2 x 200/150mm (8/6") |
|---|---|---|

**Stern Manifold**

| 6.36 | Is vessel fitted with a stern manifold: | Yes |
|---|---|---|
| 6.37 | If stern manifold fitted, state size: | 300 Millimetres |

**Cargo Heating**

| 6.38 | Type of cargo heating system? | heating coil | |
|---|---|---|---|
| 6.39 | If fitted, are all tanks coiled? | Yes | |
| 6.40 | If fitted, what is the material of the heating coils: | Stainless Steel | |
| 6.41 | Maximum temperature cargo can be loaded/maintained: | 80.0 &deg;C / 176.0 &deg;F | 80 &deg;C / 176 &deg;F |

**Tank Coating**

| 6.42 | Are cargo, ballast and slop tanks coated? | Coated | Type | To What Extent |
|---|---|---|---|---|
| | Cargo tanks: | Yes | Sigma Phenoliv Finish Epoxy | Whole Tank |
| | Ballast tanks: | Yes | Epoxy | Whole Tank |
| | Slop tanks: | Yes | | Whole Tank |
| 6.43 | If fitted, what type of anodes are used: | Zinc | | |

| 7. | INERT GAS AND CRUDE OIL WASHING | |
|---|---|---|
| 7.1 | Is an Inert Gas System (IGS) fitted: | No |
| 7.2 | Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen: | |
| 7.3 | Is a Crude Oil Washing (COW) installation fitted: | No |

| 8. | MOORING | | | | | |
|---|---|---|---|---|---|---|
| 8.1 | Mooring wires (on drums) | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | | Millimetres | Not Applicable | Metres | Metric Tonnes |
| | Main deck fwd: | | Millimetres | Not Applicable | Metres | Metric Tonnes |
| | Main deck aft: | | Millimetres | Not Applicable | Metres | Metric Tonnes |
| | Poop deck: | | Millimetres | Not Applicable | Metres | Metric Tonnes |
| 8.2 | Wire tails | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | | Millimetres | | Metres | Metric Tonnes |
| | Main deck fwd: | | Millimetres | | Metres | Metric Tonnes |
| | Main deck aft: | | Millimetres | | Metres | Metric Tonnes |
| | Poop deck: | | Millimetres | | Metres | Metric Tonnes |
| 8.3 | Mooring ropes (on drums) | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 4 | 56 Millimetres | Estalon Karat Maxi | 220 Metres | 61.6 Metric Tonnes |
| | Main deck fwd: | | Millimetres | Not Applicable | Metres | Metric Tonnes |
| | Main deck aft: | | Millimetres | Not Applicable | Metres | Metric Tonnes |
| | Poop deck: | 4 | 56 Millimetres | Estalon Karat Maxi | 220 Metres | 61.6 Metric Tonnes |
| 8.4 | Other mooring lines | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 3 | 56 Millimetres | Estalon Karat Maxi | 220 Metres | 61.6 Metric Tonnes |
| | Main deck fwd: | | Millimetres | Not Applicable | Metres | Metric Tonnes |
| | Main deck aft: | | Millimetres | Not Applicable | Metres | Metric Tonnes |
| | Poop deck: | 4 | 56 Millimetres | Estalon Karat Maxi | 220 Metres | 61.6 Metric Tonnes |
| 8.5 | Mooring winches | | No. | # Drums | Brake Capacity |
| | Forecastle: | | 2 | Double Drums | 36 Metric Tonnes |
| | Main deck fwd: | | | N/A | Metric Tonnes |
| | Main deck aft: | | | N/A | Metric Tonnes |
| | Poop deck: | | 2 | Double Drums | 36 Metric Tonnes |
| 8.6 | Mooring bitts | | No. | SWL |
| | Forecastle: | | 6 | 26 Metric Tonnes |
| | Main deck fwd: | | 4 | 20 Metric Tonnes |
| | Main deck aft: | | 2 | 20 Metric Tonnes |
| | Poop deck: | | 6 | 26 Metric Tonnes |

| 8.7 | Closed chocks and/or fairleads of enclosed type | No. | SWL |
|---|---|---|---|
| | Forecastle: | 7 | Metric Tonnes |
| | Main deck fwd: | 1 + 1 (P + S) | Metric Tonnes |
| | Main deck aft: | 4 + 4 (P + S) | Metric Tonnes |
| | Poop deck: | 10 | Metric Tonnes |
| **Emergency Towing System** | | | |
| 8.8 | Type / SWL of Emergency Towing system forward: | | Metric Tonnes |
| 8.9 | Type / SWL of Emergency Towing system aft: | | Metric Tonnes |
| **Anchors** | | | |
| 8.10 | Number of shackles on port cable: | | |
| 8.11 | Number of shackles on starboard cable: | | |
| **Escort Tug** | | | |
| 8.12 | What is SWL and size of closed chock and/or fairleads of enclosed type on stern: | 61 Metric Tonnes | |
| 8.13 | What is SWL of bollard on poopdeck suitable for escort tug: | | 26 Metric Tonnes |
| **Bow/Stern Thruster** | | | |
| 8.14 | What is brake horse power of bow thruster (if fitted): | 600 bhp | 447.42 Kilowatt |
| 8.15 | What is brake horse power of stern thruster (if fitted): | bhp | 0 Kilowatt |
| **Single Point Mooring (SPM) Equipment** | | | |
| 8.16 | Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)': | N/A | |
| 8.17 | Is vessel fitted with chain stopper(s): | | |
| 8.18 | How many chain stopper(s) are fitted: | | |
| 8.19 | State type of chain stopper(s) fitted: | . | |
| 8.20 | Safe Working Load (SWL) of chain stopper(s): | | Metric Tonnes |
| 8.21 | What is the maximum size chain diameter the bow stopper(s) can handle: | | Millimetres |
| 8.22 | Distance between the bow fairlead and chain stopper/bracket: | | Millimetres |
| 8.23 | Is bow chock and/or fairlead of enclosed type of OCIMF recommended size (600mm x 450mm)? If not, give details of size: | | |
| **Lifting Equipment** | | | |
| 8.24 | Derrick / Crane description (Number, SWL and location): | Cranes: 1 x 10 Tonnes, | |
| 8.25 | What is maximum outreach of cranes / derricks outboard of the ship's side: | | 5 Metres |
| **Ship To Ship Transfer (STS)** | | | |
| 8.26 | Does vessel comply with recommendations contained in OCIMF/ICS Ship To Ship Transfer Guide (Petroleum or Liquified Gas, as applicable): | Yes | |

| 9. | MISCELLANEOUS | | |
|---|---|---|---|
| **Engine Room** | | | |
| 9.1 | What type of fuel is used for main propulsion? | IFO 380 | |
| 9.2 | What type of fuel is used in the generating plant? | IFO 380 | |
| 9.3 | Capacity of bunker tanks - IFO and MDO/MGO: | 680 Cu. Metres | 72 Cu. Metres 0 Cu. Metres |
| 9.4 | Is vessel fitted with fixed or controllable pitch propeller(s)? | Fixed Pitch | |
| **Insurance** | | | |
| 9.5 | P & I Club - Full Style: | GARD | |
| 9.6 | P & I Club coverage - pollution liability coverage: | 1000000000 | |
| **Port State Control** | | | |
| 9.7 | Date and place of last Port State Control inspection: | Mar 17, 2009 / Rotterdam | |
| 9.8 | Any outstanding deficiencies as reported by any Port State Control: | No | |
| 9.9 | If yes, provide details: | n/a | |
| **Recent Operational History** | | | |
| 9.10 | Has vessel been involved in a pollution, grounding, serious casualty or collision incident during the past 12 months?  If yes, full description: | Pollution: N/A, n/a Grounding: No , n/a Serious casualty. No . Collision: No , n/a | |

| 9.11 | Last three cargoes / charterers / voyages (Last / 2nd Last / 3rd Last): | |
|------|---------------------------------------------------------------------|---|
| **Vetting** | | |
| 9.12 | Date/Place of last SIRE Inspection: | Sep 08, 2009 / Rotterdam |
| 9.13 | Date/Place of last CDI Inspection: | Feb 07, 2009 / Stanlow |
| 9.14 | Recent Oil company inspections/screenings (To the best of owners knowledge and without guarantee of acceptance for future business)*: <br><br> *Blanket "approvals" are no longer given by Oil Majors and ships are accepted for the voyage on a case by case basis.* | PSC / CDI |

Version 3 (INTERTANKO / Q88.com)

**Association of Ship Brokers
& Agents (U.S.A.), Inc.
October 1977**

**CODE WORD FOR THIS
CHARTER PARTY:
ASBATANKVOY**

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

                Place           Date

IT IS THIS DAY AGREED between _____
Chartered owner/owner (hereinafter called the "Owner") of _____
SS/MS _____ (hereinafter called the "Vessel")
And _____ (hereinafter called the "Charterer")
That the transportation herein provided for will be performed subject to the terms and conditions of this charter party, which includes the Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

A.      Description and Position of Vessel:

Net Registered Tonnage:

Deadweight:           tons (2240 lbs.)        Classed:

Loaded draft of Vessel on assigned summer freeboard ft.    in. in salt water.

Capacity for cargo:      tons (of 2240 lbs. Each)   % more or less, Vessel's option

Coated:        ___ Yes ___ No

Coiled:        ___ Yes ___ No    Last two cargoes:

Now:                Expected Ready:

B.      Laydays:

          Commencing:         Cancelling:

C.      Loading Port(s):

                            Charterer's option

**EXHIBIT**

**2**

tabbies

D.      Discharging Port:

Charterer's option

E.      Cargo:

Charterer's option

F.      Freight Rate:

per ton (of 2240 lbs. Each).

G.      Freight Payable to:                                         at

H.      Total Laytime in Running Hours:

I.      Demurrage per day:

J.      Commission of        % is payable by Owner to

on the actual amount freight, when and as freight is paid.

K.      The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.      Tovalop:  Owner warrants vessel to be member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.      Special Provisions.

        IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness to signature of:                   _____

                                          By: _____

Witness to signature of:                   _____

By: _____

## PART II

1. WARRANTY-VOYAGE-CARGO. The vessel, classed as specified in Part I hereof, and to be maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer's full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.
(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

| | On a voyage to a port or ports in: |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | Or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTER | Mediterranean (from Western Hemisphere). |

© Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used Laytime.

5.    LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the canceling date stipulated in Part I, the Charterer shall have the option of canceling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e. finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs.; However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has not control, such delay shall no count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as Laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel is moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. (a) Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate stipulated in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge because by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo,

the rate of demurrage shall be reduced to one-half the amount stated in Part I per running hour or pro rata for part of an hour for demurrage incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout stoppage or restraint of labor for Master, officers and crew of the vessel or tugboat or pilots.

9. SAFE BERTHING-SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart there from always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10.        PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging I all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the charter, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES-TAXES-WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the Basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a).  CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 degrees F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 degrees F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available the Charterer, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

© Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time  consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17. QUARANTINE. (a) Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not to be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION.    If the Vessel, prior to or after entering upon this Charter, has docked or docks at an wharf which is not rat-free or stegomyia-free, she shall before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.         GENERAL EXCEPTIONS CLAUSE.  The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:-any act, neglect, default or barratry of the Master, pilots, mariners or their servants of the Owner in the navigation or management of the Vessel; fire, unless caused by personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the vessel nor Master or Owner, nor the Charterer, shall, unless so otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from;-Act of God; act of War; perils of the sea; act of public enemies, pirates or assailing thieves; arrest of restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING
(a) The master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter.  The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading.  In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT.  This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation.  The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act.  If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii) JASON CLAUSE.  In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Owner is not responsible by statute, contract, or otherwise, the cargo shippers, consignees, or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.  If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the salving ship or ships belong to strangers.  Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, by made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE.  General average shall be adjusted, stated and settled, according to York-Antwerp Rules 1950, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter.  If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer.  Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges.  General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested.   Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized an licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME COLLISION CLAUSE. If the Vessel comes into collision with another ship as a result of negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. The foregoing provisions shall also apply where the owners operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of the international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge-the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo threat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port the Owner shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo threat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

© The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, water, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or incompliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or incompliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owner shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel or stores at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, dead freight, demurrage and costs, including attorney's fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any bills of lading covering the same, or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the city of London whichever place is specified in Part 1 of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service

upon any officer of the other, wherever may be found,  of a written notice specifying the name and address of the arbitrator chosen by the first moving party and brief description of the disputes or differences which such party desires to put to arbitration.  If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party.  In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court maritime jurisdiction in the city above mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precise the same force and effect as if such arbitrator had been appointed by the tow arbitrators.  Until each time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this charter for hearing and determination.  Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25.  SUBLET.  Charterer shall have the right to sublet the Vessel.  However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26.  OIL POLLUTION CLAUSE.  Owner agrees to participate in Charterer's program covering oil pollution avoidance.  Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place.  All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange.  If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc. retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage.  Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

BILL OF LADING

Shipped in apparent good order and condition by _____

On board the _____ Motorship/Steamship _____

whereof _____ is Master, at the port of _____

_____

_____

_____

to be delivered at the port of _____

or  so near thereto as the Vessel can safely get, always afloat, unto _____

_____

or order on payment of freight at the rate of_____

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London _____

Between _____ and _____, as Charterer, and all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____day of

_____

Master



## EITZEN GROUP
Est. 1883

Carib Petroleum Inc.

3169 Via Abitare
Miami, FL  33133
United States of America

Invoice Date   7Jan2010
Invoice No    CC/15665
Our Reference  2009/1916

---

## DEMURRAGE INVOICE

| | | | |
|---|---|---|---|
| *C/P Date:* | *11Dec2009* | *Voyage no.:* | *17* |
| *Vessel:* | *Glen* | | |
| *Charterer:* | *Carib Petroleum Inc.* | | |
| *Fixture Ref.:* | *2009/1916* | | |

**Note all values are in USD**

| | |
|---|---|
| Demurrage CPP: Loading Puerto Cabello Discharging Barahona | 10.659,72 |
| **TOTAL** | **10.659,72** |
| | **E. & O. E.** |

DUE DATE : 7Jan2010

***Please remit according to the details below quoting Vessel Name, Our Reference and invoice no.***

Nordea Bank Danmark A/S
Corporate Division Denmark
Postboks 850
0900 Copenhagen C
Denmark
Account No.: ██████5308
Swift: NDEADKKK
IBAN No.: DK███████████5308
In Favour of: Eitzen Chemical
Ref.: Vessel/Voyage No/Invoice No


EXHIBIT
3

**EITZEN CHEMICAL A/S**
Camillo Eitzen House, Amerika Plads 38, 2100 Copenhagen, Denmark
CVR No  20 94 07 94 * www.eitzen-chemical.com
Tel. +45 3697 0300

FW: FINAL RECAP 'SICHEM CHALLENGE' / CARIB PETROLEUM

**Subject:** FW: FINAL RECAP 'SICHEM CHALLENGE' / CARIB PETROLEUM
**From:** "Ty Shimada - Eitzen Chemical US" <tys@eitzen-chemical.com>
**Date:** Fri, 9 Jul 2010 15:13:20 +0200
**To:** "Ty Shimada - Eitzen Chemical US" <tys@eitzen-chemical.com>

Brgrds,

Ty Shimada / Eitzen Chemical USA
oprusa@eitzen-chemical.com

-----Original Message-----
From: Eitzen Chemical, USA - Chartering
Sent: Monday, June 21, 2010 1:26 PM
To: Eitzen Chemical, USA - Operation
Cc: Eitzen Chemical, USA - Chartering
Subject: FW: FINAL RECAP 'SICHEM CHALLENGE' / CARIB PETROLEUM
Importance: High

Ty - recap below. Pls note orders on staying outside port limits etc.

Brgds, Alex

-----Original Message-----
From: FIX@SOUTHPORTMARITIME.COM [mailto:FIX@SOUTHPORTMARITIME.COM]
Sent: Monday, June 21, 2010 1:08 PM
To: Eitzen Chemical, USA - Chartering
Subject: FINAL RECAP 'SICHEM CHALLENGE' / CARIB PETROLEUM
Importance: High

TO..: EITZEN
ATTN: CHARTERING
FROM: Southport Maritime Inc.
DATE: 21-JUN-2010 13:07
MSG.: 818184

Attached File:
"C:\DOCUME~1\spare\LOCALS~1\Temp\ForwardingFiles\Sichem Challenge_ q88.pdf"  21-Jun-2010
08:48:08   46,257 Bytes.

This is Southport Maritime Inc. - June 21, 2010

To : Carib Petroleum - Carlos Gamboa



EXHIBIT
4

FW: FINAL RECAP 'SICHEM CHALLENGE' / CARIB PETROLEUM

To : Eitzen USA - Alex Ericksen

Re : MT 'Sichem Challenge' / Carib Petroleum
     C/P June 21, 2010

Private and Confidential
------------------------

With all subjects lifted, we are pleased to recap herebelow terms and conditions of fixture account Carib
Petroleum, as follows :

Vessel      : MT 'Sichem Challenge' (q88 attached)

for

Cargo       : Charterers option upto full cargo
              Distillates - max 2 grades wvns
              intended cargo is Tecsol (Diesel without aromatics API abt 33)

Load        : 1 SP Puerto Cabello (Venezuela)

Discharge   : 1 SP Barahona (Dominican Republic) and/or
              1 SP Puerto Plata (Dominican Republic)

Laydays     : June 23 (06:00 hrs) - June 24, 2010
              vsl is prompt off Puerto Cabello and to remain outside the
              port until cleared by Charterers

Freight     : Lump Sum USD 130,000 basis 1 Load/1 Disport Barahona
              Lump Sum USD 145,000 basis 1 Load/1 Disport Puerto Plata
              Lump Sum USD 172,000 basis 1 Load/both Disports
              Payment before breaking bulk

Demurrage   : USD 10,000 pdpr

Laytime     : 72 hrs total if 1 load/2 disports
              48 hrs total if 1 load/1 disport

- Freight/Cancellation fee to be paid to Owners designated account, as
  follows :
  Nordea EC Sin USD
  Nordea Bank Danmark A/S
  Corporate Division Denmark
  Postboks 850, 0900
  Copenhagen C, Denmark
  Swift Code: NDEADKKK
  Credit: Eitzen Chemical
  Account Number: ████████ ██4 273
  IBAN Number: DK███████████4273

- Special clause : Charterers option to cancel this C/P latest June 26 at
  12:00 hrs NY time against a payment of a Lump Sum of USD 55,000 which

FW: FINAL RECAP 'SICHEM CHALLENGE' / CARIB PETROLEUM

    to be paid to Owners account above as soon as invoice received.
     Such amount to be credited against Freight payment.
    - Asbatankvoy C/P form
    - Charterers agents at load/disport(s) provided competitive fees
    - Worldscale Terms,Conditions

    2.5 pct brokerage commission on freight/demurrage due by Owners to Southport Maritime Inc.
    No address commission

    End recap

    Regards,
    Southport Maritime Inc.
    as brokers only

-------------------------------------------------------------------------
Southport Maritime Inc. as brokers only.

**SChallenge-v61-15529-CaribDem.pdf**

**FW: FINAL RECAP 'SICHEM CHALLENGE' / CARIB PETROLEUM.eml**

**Sichem Challenge_ q88.pdf**

**img-707144810-0001.pdf**

INTERTANKO'S STANDARD TANKER CHARTERING QUESTIONNAIRE 88 (Q88)                    **Version**

## VESSEL DESCRIPTION

| | | |
|---|---|---|
| .1 | Date updated: | Jun 18, 2010 |
| .2 | Vessel's name: | Sichem Challenge |
| .3 | IMO number: | 9196448 |
| .4 | Vessel's previous name(s) and date(s) of change: | Songa Challenge (Jan 23, 2007) NORTH CHALLENGE (Jul 27, 2006) Queen of Montreux (Jul 01, 1999) |
| .5 | Date delivered: | Dec 17, 1998 |
| .6 | Builder (where built): | WATANABE ZOSEN |
| .7 | Flag: | Singapore |
| .8 | Port of Registry: | Singapore |
| .9 | Call sign: | 9VAA5 |
| .10 | Vessel's satcom phone number: | 456 532 710 "C" |
| | Vessel's fax number: | 356 532 712 "B" |
| | Vessel's telex number: | 356 53 2714 "B" |
| | Vessel's email address: | sichem.challenge@vsl.ems-asa.com |
| .11 | Type of vessel: | Oil/Chemical Type 2 & 3 |
| .12 | Type of hull: | Double Hull |

## Classification

| | | | |
|---|---|---|---|
| .13 | Classification society: | Nippon Kaiji Kyokai | |
| .14 | Class notation: | Oil, Molasses, Chem II & III | |
| .15 | If Classification society changed, name of previous society: | N/A | |
| .16 | If Classification society changed, date of change: | Not Applicable | |
| .17 | IMO type, if applicable: | 2 | |
| .18 | Does the vessel have ice class? If yes, state what level: | No , N/A | |
| .19 | Date / place of last dry-dock: | Dec 01, 2008 | N/A |
| .20 | Date next dry dock due | Jun 16, 2011 | |
| .21 | Date of last special survey / next survey due: | Dec 08, 2008 | Dec 16, 2013 |
| .22 | Date of last annual survey: | | |
| .23 | If ship has Condition Assessment Program (CAP), what is the latest overall rating: | 0 | |
| .24 | Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS): If yes, what is the expiry date? | N/A | |

## Dimensions

| | | | | |
|---|---|---|---|---|
| .25 | Length Over All (LOA): | | | 124.02 l |
| .26 | Length Between Perpendiculars (LBP): | | | 116 l |
| .27 | Extreme breadth (Beam): | | | 20.624 l |
| .28 | Moulded depth: | | | 11.2 l |
| .29 | Keel to Masthead (KTM) / KTM in collapsed condition (if applicable): | 34 M | | 34.0 l |
| .30 | Bow to Center Manifold (BCM) / Stern to Center Manifold (SCM): | 62.035 M | | 61.985 l |
| .31 | Distance bridge front to center of manifold: | | | 37.165 l |
| .32 | Parallel body distances: | Lightship | Normal Ballast | Summer Dwt |

| | | | |
|---|---|---|---|
| Forward to mid-point manifold: | 15.6 M | 15.7 M | 17 l |
| Aft to mid-point manifold: | 17.9 M | 16.9 M | 17 l |
| Parallel body length: | 33.5 M | 32.6 M | 34.6 l |

| | | | |
|---|---|---|---|
| .33 FWA at summer draft / TPC immersion at summer draft: | 191 MM | | 21 M |
| .34 What is the max height of mast above waterline (air draft) | Full Mast | Collapsed Mast | |
| Lightship: | 31.570 M | 31.570 l | |
| Normal ballast: | 28.239 M | 28.239 l | |
| At loaded summer deadweight: | 25.436 M | 25.436 l | |

## onnages

| | |
|---|---|
| .35 Net Tonnage: | 3846 |
| .36 Gross Tonnage / Reduced Gross Tonnage (if applicable): | 7179 |
| .37 Suez Canal Tonnage - Gross (SCGT) / Net (SCNT): | 6678.9 |
| .38 Panama Canal Net Tonnage (PCNT): | 608 |

## oadline Information

| .39 Loadline | Freeboard | Draft | Deadweight | Displacement |
|---|---|---|---|---|
| Summer: | 2.662 M | 8.564 M | 12180.88 MT | 16105.09 M |
| Winter: | 2.84 M | 8.386 M | 11806.58 MT | 15730.79 M |
| Tropical: | 2.612 M | 8.614 M | 12286.28 MT | 16210.49 M |
| Lightship: | 8.859 M | 2.43 M | | 3924.21 M |
| Normal Ballast Condition: | 5.836 M | 5.761 M | 5761 MT | 9685.3 M |

| | |
|---|---|
| .40 Does vessel have multiple SDWT? | No |
| .41 If yes, what is the maximum assigned deadweight? | 0 M |

## ownership and Operation

| | |
|---|---|
| .42 Registered owner - Full style: | Eitzen Chemical (Singapore) Pte Ltd<br>One Temasek Avenue, # 35-05 Millenia<br>Tower, Singapore 039192<br>Tel: + 65 6325 5777<br>Fax: + 65 6337 2302<br>Email: oprcph@eitzen-chemical.com |
| .43 Technical operator - Full style: | EMS Ship Management (Singapore) Pte Ltd<br>30 Old Toh Tuck Road #05-04 Singapore<br>597654<br>Tel: +65 6466 8551<br>Fax: +65 6466 5016<br>Email: marine.sg@ems-asa.com |
| .44 Commercial operator - Full style: | Eitzen Chemical USA<br>1 Gorham Island Rd Westport, CT 06880<br>USA<br>Tel: +1 203 341 3620<br>Fax: na<br>Email: oprusa@eitzen-chemical.com |
| .45 Disponent owner - Full style: | N/A |

| CERTIFICATION | Issued | Last Annual or Intermediate | Expires |
|---|---|---|---|
| .1 Safety Equipment Certificate: | Dec 08, 2008 | | Dec 16, 2013 |

| | | | | |
|---|---|---|---|---|
| .2 | Safety Radio Certificate: | Dec 08, 2008 | | Dec 16, 2013 |
| .3 | Safety Construction Certificate: | Dec 08, 2008 | | Dec 16, 2013 |
| .4 | Loadline Certificate: | Dec 08, 2008 | | Dec 16, 2013 |
| .5 | International Oil Pollution Prevention Certificate (IOPPC) | Dec 08, 2008 | | Dec 16, 2013 |
| .6 | Safety Management Certificate (SMC): | Sep 25, 2007 | | Jul 15, 2012 |
| .7 | Document of Compliance (DOC): | Feb 07, 2007 | Not Applicable | Oct 31, 2010 |
| .8 | USCG (specify: COC, LOC or COI): | | | |
| .9 | Civil Liability Convention Certificate (CLC): | Feb 04, 2010 | | Feb 20, 2011 |
| .10 | Civil Liability for Bunker Oil Pollution Damage Convention Certificate (CLBC): | Feb 04, 2010 | | Feb 20, 2011 |
| .11 | U.S. Certificate of Financial Responsibility (COFR): | Mar 03, 2010 | | Mar 07, 2013 |
| .12 | Certificate of Fitness (Chemicals): | Dec 08, 2008 | | Dec 16, 2013 |
| .13 | Certificate of Fitness (Gas): | Not Applicable | | Not Applicable |
| .14 | Certificate of Class: | May 10, 2007 | | Dec 16, 2013 |
| .15 | International Ship Security Certificate (ISSC): | Sep 25, 2007 | | Jul 15, 2012 |
| .16 | International Sewage Pollution Prevention Certificate (ISPPC) | Dec 08, 2008 | | Dec 16, 2013 |
| .17 | International Air Pollution Prevention Certificate (IAPP): | Dec 08, 2008 | | Dec 16, 2013 |

**Documentation**

| | | | | |
|---|---|---|---|---|
| .18 | Does vessel have all updated publications as listed in the Vessel Inspection Questionnaire, Chapter 2- Question 2.24, as applicable: | | | |
| .19 | Owner warrant that vessel is member of ITOPF and will remain so for the entire duration of this voyage/contract: | | | Yes |

| | **CREW MANAGEMENT** | |
|---|---|---|
| .1 | Nationality of Master: | India |
| .2 | Nationality of Officers: | Russia, Latvia, Ukraine, Estonia |
| .3 | Nationality of Crew: | Russia, Latvia |
| .4 | If Officers/Crew employed by a Manning Agency - Full style: | Officers: EMS Crew Management 2 Elizabetes Street, 6th floor 1-9, Riga LV1010, Latvia Tel: +371 732 4770 Fax: +371 732 4302 Email: ame@lv.tesma.net Crew: Same as for Officers Same as above Tel: Same as above Fax: Same as above Email: Same as above |
| .5 | What is the common working language onboard: | English |
| .6 | Do officers speak and understand English: | Yes |
| .7 | In case of Flag Of Convenience, is the ITF Special Agreement on board: | Yes |

| | **HELICOPTERS** | |
|---|---|---|
| .1 | Can the ship comply with the ICS Helicopter Guidelines: | N/A |
| .2 | If Yes, state whether winching or landing area provided: | |

| | **FOR USA CALLS** | |
|---|---|---|
| .1 | Has the vessel Operator submitted a Vessel Spill Response Plan to the US Coast Guard which has been approved by official USCG letter: | Yes |
| .2 | Qualified individual (QI) - Full style: | ECM Maritime Services LLC<br>64,danbury Road Wilton ,CT 06897-4406<br>USA<br>Tel: (203) 7616 030<br>Fax: 9203) 761 6085<br>Email: ecmwilton@ecmmaritime.com |
| .3 | Oil Spill Response Organization (OSRO) -Full style: | National Response Corporation<br>National Response Corp(NaRCo) 3500<br>Sunrise Highway,Ste.T103 Graet River ,NY<br>11739 USA<br>Tel: +1 631 224 9141<br>Fax: +1 631 224 9086<br>Email: iocdo@nrcc.com |
| .4 | Has technical operator signed the SCIA / C-TPAT agreement with US customs concerning drug smuggling: | Yes |

| | **CARGO AND BALLAST HANDLING** | |
|---|---|---|
| | **Double Hull Vessels** | |
| .1 | Is vessel fitted with centerline bulkhead in all cargo tanks: | No |
| .2 | If Yes, is bulkhead solid or perforated: | |
| | **Cargo Tank Capacities** | |
| .3 | Capacity (98%) of each natural segregation with double valve (specify tanks): | |
| .4 | Total cubic capacity (98%, excluding slop tanks): | 13265.3 M |
| .5 | Slop tank(s) capacity (98%): | 0 M |
| .6 | Residual/Retention oil tank(s) capacity (98%), if applicable: | M |
| .7 | Does vessel have Segregated Ballast Tanks (SBT) or Clean Ballast Tanks (CBT): | SBT |
| | **SBT Vessels** | |
| .8 | What is total capacity of SBT? | 3967 M |
| .9 | What percentage of SDWT can vessel maintain with SBT only? | 30 % |
| .10 | Does vessel meet the requirements of MARPOL Annex I Reg 18.2: (previously Reg 13.2) | Yes |
| | **Cargo Handling** | |
| .11 | How many grades/products can vessel load/discharge with double valve segregation: | 22 |
| .12 | Maximum loading rate for homogenous cargo per manifold connection: | 1500 M3/HI |
| .13 | Maximum loading rate for homogenous cargo loaded simultaneously through all manifolds: | 1600 M3/HI |
| .14 | Are there any cargo tank filling restrictions. If yes, please specify: | Yes<br>Max Density 1.90, , Filling Limits 20-80 Not Recommended |

**Pumping Systems**

| | Pumps: | No. | Type | Capacity |
|---|---|---|---|---|

| Cargo: | | 20 | SUBMERGE | 200 M3/HI |
|---|---|---|---|---|
| | | 2 | SUBMERGE | 100 M3/HI |
| | | 1 | PORTABLE | 70 M3/HI |
| Stripping: | | | | M3/HI |
| Eductors: | | | | M3/HI |
| Ballast: | | 1 | VERTICAL | 400 M3/HI |

| .16 | How many cargo pumps can be run simultaneously at full capacity: | | |
|---|---|---|---|

**Cargo Control Room**

| .17 | Is ship fitted with a Cargo Control Room (CCR): | Yes |
|---|---|---|
| .18 | Can tank innage / ullage be read from the CCR: | Yes |

**Gauging and Sampling**

| .19 | Can ship operate under closed conditions in accordance with ISGOTT: | Yes |
|---|---|---|
| .20 | What type of fixed closed tank gauging system is fitted: | Floating |
| .21 | Are overfill (high-high) alarms fitted? If Yes, indicate whether to all tanks or partial: | Yes |

**Vapor Emission Control**

| .22 | Is a vapor return system (VRS) fitted: | Yes |
|---|---|---|
| .23 | Number/size of VRS manifolds (per side): | 6 MI |

**Venting**

| .24 | State what type of venting system is fitted: | FIXED /INDEPENDENT |
|---|---|---|

**Cargo Manifolds**

| .25 | Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment': | Yes |
|---|---|---|
| .26 | What is the number of cargo connections per side: | 22 |
| .27 | What is the size of cargo connections: | 150 MI |
| .28 | What is the material of the manifold: | SUS 316L |

**Manifold Arrangement**

| .29 | Distance between cargo manifold centers: | 350 MI |
|---|---|---|
| .30 | Distance ships rail to manifold: | 3000 MI |
| .31 | Distance manifold to ships side: | 3000 MI |
| .32 | Top of rail to center of manifold: | 3000 MI |
| .33 | Distance main deck to center of manifold: | 2708 MI |
| .34 | Manifold height above the waterline in normal ballast / at SDWT condition: | 9.8 M | 5.32 I |
| .35 | Number / size reducers: | 2 x 250/100mm (10/4") |
| | | 2 x 150/125mm (6/5") |
| | | 1 x 150/75mm (6/3") |
| | | 1 x 150/200mm (6/8") |
| | | 1 x 150/250mm (6/10") |

**Stern Manifold**

| .36 | Is vessel fitted with a stern manifold: | No |
|---|---|---|
| .37 | If stern manifold fitted, state size: | MI |

**Cargo Heating**

| .38 | Type of cargo heating system? | Heating coils ss. 316 |
|---|---|---|
| .39 | If fitted, are all tanks coiled? | Yes |

| .40 | If fitted, what is the material of the heating coils: | | Stainless Steel | |
|---|---|---|---|---|
| .41 | Maximum temperature cargo can be loaded/maintained: | | 65.0 °C / 149.0 °F | 65 °C / 149 ° |

**ank Coating**

| .42 | Are cargo, ballast and slop tanks coated? | Coated | Type | To What Extent |
|---|---|---|---|---|
| | Cargo tanks: | N/A | SUS 316L STAINLESS | Other |
| | Ballast tanks: | Yes | Epoxy | Whole Tank |
| | Slop tanks: | N/A | Stainless Steel | Other |
| .43 | If fitted, what type of anodes are used: | | zinc | |

### . INERT GAS AND CRUDE OIL WASHING

| .1 | Is an Inert Gas System (IGS) fitted: | N/A |
|---|---|---|
| .2 | Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen: | Nitrogen (Bottled) |
| .3 | Is a Crude Oil Washing (COW) installation fitted: | N/A |

### . MOORING

| .1 | Mooring wires (on drums) | No. | Diameter | Material | Length | Breaking Strength |
|---|---|---|---|---|---|---|
| | Forecastle: | 0 | 0 MM | | 0 M | 0 M |
| | Main deck fwd: | | MM | | M | M |
| | Main deck aft: | | MM | | M | M |
| | Poop deck: | 0 | 0 MM | | 0 M | 0 M |
| .2 | Wire tails | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | | MM | | M | M |
| | Main deck fwd: | | MM | | M | M |
| | Main deck aft: | | MM | | M | M |
| | Poop deck: | | MM | | M | M |
| .3 | Mooring ropes (on drums) | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 4 | 65 MM | Poly/Dak/P. Propylene | 220 M | 37.5 M |
| | Main deck fwd: | | MM | | M | |
| | Main deck aft: | | MM | | M | |
| | Poop deck: | 4 | 65 MM | P.Propylene | 220 M | 37.5 M |
| .4 | Other mooring lines | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 4 | 65 MM | P.P Grade II | 220 M | 37.5 M |
| | Main deck fwd: | | MM | | M | M |
| | Main deck aft: | | MM | | M | M |
| | Poop deck: | 4 | 65 MM | DO | 220 M | 37.5 M |
| .5 | Mooring winches | | No. | # Drums | Brake Capacity |
| | Forecastle: | | 2 | Double Drums | 22.5 M |
| | Main deck fwd: | | | | M |
| | Main deck aft: | | | | M |
| | Poop deck: | | 2 | Double Drums | 22.5 M |

| .6 | Mooring bitts | | No. | SWL |
|---|---|---|---|---|
| | | Forecastle: | 6 | 52 M |
| | | Main deck fwd: | 4 | 52 M |
| | | Main deck aft: | 2 | 52 M |
| | | Poop deck: | 6 | 52 M |
| .7 | Closed chocks and/or fairleads of enclosed type | | No. | SWL |
| | | Forecastle: | 5 | M |
| | | Main deck fwd: | 6 | M |
| | | Main deck aft: | 4 | M |
| | | Poop deck: | 5 | M |

**Emergency Towing System**

| .8 | Type / SWL of Emergency Towing system forward: | | M |
|---|---|---|---|
| .9 | Type / SWL of Emergency Towing system aft: | | M |

**Anchors**

| .10 | Number of shackles on port cable: | 9 |
|---|---|---|
| .11 | Number of shackles on starboard cable: | 9 |

**Escort Tug**

| .12 | What is SWL and size of closed chock and/or fairleads of enclosed type on stern: | MT | Millimetre |
|---|---|---|---|
| .13 | What is SWL of bollard on poopdeck suitable for escort tug: | | M |

**Bow/Stern Thruster**

| .14 | What is brake horse power of bow thruster (if fitted): | 650 BHP | 484.70 KW |
|---|---|---|---|
| .15 | What is brake horse power of stern thruster (if fitted): | BHP | 0 KW |

**Single Point Mooring (SPM) Equipment**

| .16 | Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)': | No |
|---|---|---|
| .17 | Is vessel fitted with chain stopper(s): | No |
| .18 | How many chain stopper(s) are fitted: | 0 |
| .19 | State type of chain stopper(s) fitted: | n/a |
| .20 | Safe Working Load (SWL) of chain stopper(s): | M |
| .21 | What is the maximum size chain diameter the bow stopper(s) can handle: | 0 MM |
| .22 | Distance between the bow fairlead and chain stopper/bracket: | MM |
| .23 | Is bow chock and/or fairlead of enclosed type of OCIMF recommended size (600mm x 450mm)? If not, give details of size: | |

**Lifting Equipment**

| .24 | Derrick / Crane description (Number, SWL and location): | Cranes: 1 x 5 Tonnes Center |
|---|---|---|
| .25 | What is maximum outreach of cranes / derricks outboard of the ship's side: | 1.8 I |

**Ship To Ship Transfer (STS)**

| .26 | Does vessel comply with recommendations contained in OCIMF/ICS Ship To Ship Transfer Guide (Petroleum or Liquified Gas, as applicable): | Yes |
|---|---|---|

## MISCELLANEOUS

## Engine Room

| | | |
|---|---|---|
| .1 | What type of fuel is used for main propulsion? | I.F.O (180CST) |
| .2 | What type of fuel is used in the generating plant? | M.D.O |
| .3 | Capacity of bunker tanks – IFO and MDO/MGO: | 681.09 M3        108.32 M 0 M |
| .4 | Is vessel fitted with fixed or controllable pitch propeller(s)? | Fixed Pitch |

## Insurance

| | | |
|---|---|---|
| .5 | P & I Club - Full Style: | BRITANNIA Tel: +44 (0)20 7407 3588 |
| .6 | P & I Club coverage - pollution liability coverage: | 1000000000 US$ |

## Port State Control

| | | |
|---|---|---|
| .7 | Date and place of last Port State Control inspection: | May 08, 2010 / Puerto Cortes, Honduras |
| .8 | Any outstanding deficiencies as reported by any Port State Control: | No |
| .9 | If yes, provide details: | N/A |

## Recent Operational History

| | | |
|---|---|---|
| .10 | Has vessel been involved in a pollution, grounding, serious casualty or collision incident during the past 12 months? If yes, full description: | Pollution: No , n/a Grounding: No , n/a Serious casualty: No , n/a Collision: No , n/a |
| .11 | Last three cargoes / charterers / voyages (Last / 2nd Last / 3rd Last): | Contact owner for details |

## Vetting

| | | |
|---|---|---|
| .12 | Date/Place of last SIRE Inspection: | N/A |
| .13 | Date/Place of last CDI Inspection: | Mar 22, 2010 / Montreal |
| .14 | Recent Oil company inspections/screenings (To the best of owners knowledge and without guarantee of acceptance for future business)*: *Blanket "approvals" are no longer given by Oil Majors and ships are accepted for the voyage on a case by case basis. | SHELL / STATOILHYDRO / CDI / PORT STATE / CHEVRON |

Version 3 (INTERTANKO / Q88.com



**Gobierno Bolivariano de Venezuela** | Ministerio del Poder Popular para la Energía y Petróleo | Dirección Regional Falcón

ACTA N°— 221

Pág.: 1/2

## ACTA

En _OCAMAR, muelles flotantes, vía base naval de Puerto Cabello_
Municipio _Puerto Cabello_, Estado _Carabobo_ a los _30_ días del mes de _Junio_ de 2.010, siendo las _5:15pm_ los ciudadanos _Juan Carlos Hernández C._ _Hernán Gómez Ron_

titulares de las cédulas de identidad números: N° _V-11496924_

N° _V-13016.444_, N° _—___, y N° _—___

respectivamente, funcionarios de éste **Ministerio del Poder Popular para la Energía y Petróleo, MENPET,** adscritos a la Dirección Regional Falcón en la Circunscripción, **EL PALITO,** en cumplimiento de las Funciones de Ley asignadas, de Inspección, Fiscalización y Control, según lo establecido en los artículos 8, 19, 20, 53, 54 y 61 de Ley Orgánica de Hidrocarburos, publicada en Gaceta Oficial N° 38.493, de fecha 04 de Agosto de 2.006, en el Decreto N° 6.732 de fecha 2 de Junio de 2.009, emanado de la presidencia de la república, publicada en Gaceta Oficial N° 39.202 de fecha 17 de Junio de 2.009, mediante el cual se dicta el "Decreto sobre Organización y Funcionamiento de la Administración Pública Nacional", estableciendo en el artículo 20 las competencias de éste Ministerio del Poder Popular para la Energía y Petróleo, MENPET; Resolución N° 247 mediante la cual se dictan las normas sobre *El transporte terrestre de productos refinados, derivados de hidrocarburos, sus desechos y productos resultantes de la actividad de industrialización de hidrocarburos o productos refinados, distintos a los combustibles*, publicada en Gaceta Oficial Número 38.226, de fecha Martes, 12 de Julio de 2005, aplicables a la empresa denominada: _TECNOPETROL C.A._

proceden a dejar constancia de lo que a continuación se especifica: _Se Tomaron muestras del producto a exportar de los tanques número 7 y 10, los cuales están divididos por cada lado del barco, stribor y babor, lo cual significa que se Tomaron 4 muestras, Identificadas como:_



Dirección Regional Falcón, Jefatura de Zona El Palito, Autopista El Palito – Morón, Km. 1, Refinería El Palito, El Palito, Puerto Cabello, Estado Carabobo. Teléfonos: 0242 – 360 42 45 ; Ext. 93 – 44 245 / 360 89 15 ; Ext. 93 – 88 915
Fax: 0242 – 360 47 96

EXHIBIT 5

C.I. V.- 11496924       C.I. V.- 13016444       C.I.V.-

Firma:                  Firma:                  Firma