**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 10-23512-CIV-SIMONTON**

EITZEN CHEMICAL A/S, and
EITZEN CHEMICAL (SINGAPORE) PTE, LTD.,

       **Plaintiffs,**

v.

CARIB PETROLEUM, a Bahamian corp.,
CARIB PETROLEUM, INC., a Florida corp.,
And CARLOS H. GAMBOA, individually,

       **Defendants.**

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

    **I.**      **INTRODUCTION**

    Plaintiffs Eitzen Chemical A/S ("Eitzen A/S") and Eitzen Chemical

(Singapore) PTE, Ltd. ("Eitzen Singapore") brought this lawsuit against Carib

Petroleum, a Bahamian corporation ("Carib-Bahamas"); Carib Petroleum Inc., a

Florida corporation ("Carib-Florida"); and Carlos Gamboa, individually (DE # 22).

Plaintiffs bring maritime claims against Defendants for recovery of damages due

to delay (known as demurrage and detention) and other costs in connection with

two contracts, known as charter parties, involving the transportation of petroleum

cargo identified as Tecsol, a diesel without aromatics.[1]  Plaintiffs seek to hold both

corporate defendants liable under the charter parties under the theory that they

"operated interchangeably and solely by Carlos Gamboa, without keeping any

---

[1]  The identity of the specific Eitzen or Carib entity that is a party to a given contract
has been an issue raised in this case.  As some of the facts below demonstrate, some
of the individuals involved in the two contracts did not make clear, at the time of
events, on whose behalf they were acting. Therefore, throughout the facts described
below, the additional abbreviations of simply "Eitzen" or "Carib" are used where the
specific Eitzen or Carib entity, respectively, has not been identified or has not
been clarified. To the extent that this distinction has legal significance, it is
discussed in the legal analysis of the claims.

[corporate] form."  (DE # 207 at 2).  In addition, they seek to hold Carlos Gamboa individually liable by piercing the corporate veil of the Carib defendants (DE # 207 at 2).

The Second Amended Complaint contains three causes of action.  Briefly stated, in Count 1, Plaintiff Eitzen A/S claims that both Carib Defendants owe demurrage[2] under a charter agreement entered into on or about December 9, 2009, involving the transportation of Tecsol from Venezuela to the Dominican Republic on board the vessel M/T GLEN ("the GLEN").  Plaintiff seeks to recover demurrage in the amount of $10,659.72 that it claims is due under the terms of the charter party, plus interest, costs and attorneys' fees (DE # 150).

In Count 2, Plaintiff Eitzen Singapore alleges that both Carib Defendants owe damages under a charter agreement entered into in June 2010, involving an agreement to transport Tecsol from Venezuela to the Dominican Republic on board the M/T SICHEM CHALLENGE.  Plaintiff alleges that loading of the cargo was halted by the Venezuelan National Guard, and the SICHEM CHALLENGE was detained; therefore Plaintiff seeks $900,975.60 as damages for the detention from July 2, 2010, until September 4, 2010, plus fees and costs.[3]  Plaintiff contends that the vessel was detained as part of an investigation of Javier Bertucci, the principal of Tecnopetrol who had supplied the Tecsol, under suspicion of illegally attempting to smuggle out of the country national diesel fuel mislabeled as Tecsol.  Plaintiffs further assert that Defendants' refusal to pay the costs associated with the vessel's detention is a breach of the charter party.

---

[2]   Demurrage is used to compensate an owner for additional delays incurred in the process of loading and discharging beyond what was anticipated in the contract; detention is a measure of damages designed to compensate the owner when there is a problem and the vessel is not authorized to pursue its normal operation (DE # 193 at 40-41).

[3]   In their post-trial proposed Findings of Fact, Plaintiff has reduced the amount of this claim to $897,084.19.

2

In Count 3, the Plaintiffs seek to pierce the corporate veil of the Carib Defendants and hold Carlos Gamboa personally liable for the damages sought in Counts 1 and 2. Plaintiffs allege that Defendant Carlos Gamboa fraudulently employed his business entities to aid in the alleged smuggling of mislabeled Tecsol out of Venezuela.  The Plaintiffs contend that because of Defendant Carlos Gamboa's fraudulent intent, he is personally liable for the amounts sought under the alleged breach of the GLEN and SICHEM CHALLENGE charter parties.  Plaintiffs additionally allege that Gamboa was simply the alter-ego of the Carib entities, justifying piercing the corporate veil with regard to the first two causes of action alleged.

In response to the Second Amended Complaint, the Defendants have each filed an Answer and Affirmative Defenses (DE ## 36, 37, 38), in which they each generally deny the substantive allegations of the Second Amended Complaint, and raise various affirmative defenses.  Following the trial, the Defendants filed post-trial memoranda (DE ## 215, 216) in which they relied on the following defenses.[4]  As to Count 1, Defendants assert that Eitzen A/S is not the owner of the GLEN and has not demonstrated that it was damaged as a result of the charterer's alleged breach of contract; and, therefore, Eitzen A/S is not entitled to the claimed demurrage (DE # 215 at 9-11, 22-24).[5]  As to Count 2, the defendants assert they are not liable for any claimed damages as to the SICHEM CHALLENGE since (1) the alleged damages resulted from  the detention of the vessel by the Venezuelan government, which constitutes a restraint of princes that precludes liability under the terms of Clause 19 of the Asbatankvoy form made a part of the charter

---

[4]  Defense counsel agreed in closing argument, which was held after the submission of post-trial briefing, that the only issues in dispute after the trial were included in the post-trial briefs and proposed findings of fact and conclusions of law, (DE # 222 at 52-53). Therefore, this Order does not address other issues that were raised in the pleadings or at the pretrial conference.

[5]  In his closing argument, defense counsel agreed that the only issue regarding the payment of demurrage with respect to the GLEN was whether Eitzen was the proper plaintiff since it was not the owner of the GLEN, (DE # 222 at 50-51).

agreement (DE # 215 at 12-18, 24-25); (2) the plaintiff breached its duty to mitigate damages (DE # 215 at 25-27); (3) the plaintiff failed to prove its damages associated with the detention (DE # 215 at 27-29).  As to both Counts 1 and 2, Defendant Carib-Florida asserts that it was not a party to either contract and therefore Plaintiffs have failed to establish that is should be held liable for the alleged breaches by Carib-Bahamas (DE # 215 at 7-9).[6]  As to Count 3, Defendant Carlos Gamboa asserts that the plaintiff has failed to prove its claim that the corporate veil should be pierced and Carlos Gamboa held individually liable, under either Bahamian law or Florida law, (DE # 215 at 29-35).

The case proceeded to a non-jury trial before the undersigned Magistrate Judge based upon the consent of the parties.  To put the detailed factual and legal determinations in context, a brief overview of the ultimate facts and conclusions is useful.  Defendant Carlos Gamboa owned and operated Defendants Carib-Florida and Carib-Bahamas.  Carib-Bahamas entered into contracts (known as charter parties) for the charter of the GLEN, which was operated by Plaintiff Eitzen A/S and the SICHEM CHALLENGE, which was owned by Eitzen Singapore.

As to the GLEN, the only issue in the case is whether Eitzen A/S is the real party in interest and has standing to bring a claim for demurrage, or whether the owner of the GLEN must bring the claim. The undersigned concludes that Eitzen A/S is permitted to bring this claim as the bailee of the GLEN.

As to the SICHEM CHALLENGE, which was detained by the Venezuelan authorities during the course of loading its cargo, the undersigned finds that the cargo being loaded was diesel for which there was no lawful export permit; that the cargo had

---

[6]  In closing argument, Defendant Carib-Florida argued that there was no alter ego or veil piercing claim raised as a basis to hold Carib-Florida liable for the acts of Carib-Bahamas; and, that the only claim was that the two entities were operated as one corporation such that both were parties to the contract (DE # 222 at 41).  The Court then stated that the only veil-piercing claim was as to Gamboa individually, (DE # 222 at 41); the Plaintiffs did not refute this statement in their rebuttal closing.

been misdescribed as Tecsol, resulting in the detention; and, that Carlos Gamboa and Carib-Bahamas were aware of this subterfuge.  Therefore Carib-Bahamas is liable under the contract for damages resulting from this detention, and cannot avail itself of the exception to liability in the contract for damages resulting from government seizures (known as the restraint of princes exception).

As to both charter parties, the Plaintiff has failed to establish that Carib-Florida was a party to the contracts or should be held liable as the alter ego of Carib-Bahamas; or that the corporate veil of Carib-Bahamas should be pierced to hold Carlos Gamboa liable for breach of the charter parties.

Based upon an evaluation of all of the evidence, the undersigned makes the following Findings of Fact and Conclusions of Law.

II.     <u>FINDINGS OF FACT[7]</u>

A.     <u>The Parties and Related Entities</u>

1. <u>*The Eitzen Entities*</u>

Eitzen Chemical A/S is in the business of operating approximately 80 petrochemical tankers involved in the transportation of chemicals for charterers around the world.  There are various subsidiary Eitzen companies, including Eitzen Chemical USA and Eitzen Chemical (Singapore), through which Eitzen Chemical A/S conducts its business enterprise.  In addition, Eitzen A/S operates pool agreements involving vessels which it does not own, such as the M/T GLEN (GR 12-13).[8]  Under these agreements, Eitzen S/A is the commercial manager of the vessel, and operates the vessel, collects the payments, and makes monthly payments to the owners of the vessel in accordance with

---

[7] To the extent that Findings of Fact are more properly characterized as Conclusions of Law, and vice versa, the undersigned intends that they be treated as such.

[8]  The letters "GR" are used to refer to the deposition of George Rozanovich, which was read into the record at trial.  George Rozanovich is the General Manager for Eitzen Chemical USA.

the terms of the pool agreement (GR at 8-14).  In the case at bar, with respect to the GLEN, although there was uncontroverted testimony that the GLEN was chartered pursuant to a pool agreement, the pool agreement was not introduced into evidence, and the exact terms of this agreement were not elicited in the testimony of the Eitzen witnesses.

Eitzen Chemical USA serves as the commercial manager with respect to various vessels that are part of the Eitzen fleet (GR at 5-11).  Eitzen Chemical USA does not own vessels, but arranges charters and sometimes has "commercial control" of a given vessel.  In other words, Eitzen Chemical USA is in the business of acting as an agent to represent a vessel owner, who is identified in the respective q88 for a charter party (DE# 193 at 27-28, 53; GR at 5).  For example, while Eitzen did not own the GLEN, Eitzen Chemical USA fixed charters on behalf of the owners of the GLEN (TS at 25).[9]  Eitzen Chemical USA does not charter vessels in its own name.  Eitzen Chemical USA is not a party to any charter agreement, either as owner or charterer.  Finally, there are no instances where Eitzen Chemical USA is assigned rights under a charter party (GR at 8, 10-11).

Casper Cleemann testified as the corporate representative for the Plaintiffs, and was a forthright and credible witness.  Mr. Cleemann is employed by Plaintiff Eitzen A/S, and is the general manager of the Claims Department.  He explained that there is a Chartering Department that is in charge of arranging the charters (commonly known as fixtures) of vessels. Once the charter is arranged, an Operations Department handles the actual performance of the voyage.  When the voyage is complete, the Claims Department handles collections of freight charges, demurrages, claims, and disputes.  The Claims

---

[9]  The letters "TS" are used to refer to the deposition testimony of Ty Shimada, which was read at trial.

Department handles claims for all vessels that are owned or operated by any Eitzen Chemical entity (DE # 188 at 6 - 14).

The chartering department of Eitzen Chemical USA was the entity that negotiated for the charter of both the GLEN and the SICHEM CHALLENGE by Carib.  This occurred when Carlos Gamboa of Carib contacted Luis Tewes, a charter broker employed by Southport Maritime, to locate a vessel that could transport Tecsol.  Tewes then called Eitzen Chemical USA. Once the terms of the charter were fixed, the operation of the GLEN was handled by Eitzen A/S out of Denmark.  The operation of the SICHEM CHALLENGE was handled by the operations department of Eitzen Chemical USA, primarily by Ty Shimada.

At all relevant times, Plaintiff Eitzen A/S was the commercial operator, of the M/T GLEN (DE # 188 at 7; PX 2).[10]  The M/T GLEN is owned by Open Waters Glen PTE, Ltd. (PX 2), an entity that is not a party to this lawsuit.  Claims related to the GLEN were handled by Eitzen A/S.  The testimony of Carlos Gamboa and the bank records of Carib-Florida reflect that Carib-Florida made payments from its accounts to Eitzen Chemical A/S with respect to the charter of the GLEN (PX 87).

At all relevant times, Plaintiff Eitzen Singapore was the owner of the M/T SICHEM CHALLENGE, and claims related to the SICHEM CHALLENGE were handled by Eitzen A/S (DE # 188 at 12-13; PX 17).

## 2. *The Carib Entities*

Carib-Bahamas was incorporated in 2002, and Carib-Florida was incorporated in 2009 (DE # 189 at 7).  Carlos Gamboa is the principal of and controls both entities (DE# 189 at 5).  Carib-Bahamas began doing business with Southport Marine Services prior to the time that Carib-Florida was incorporated, and at the outset of the relationship

---

[10]  The letters "PX" are used to designate Plaintiff's exhibits.

completed a company profile that reflected its place of incorporation.  Southport was never advised that a Florida corporation was formed (DE # 189 at 16).

According to the uncontroverted testimony of Carlos Gamboa, the only business conducted by a Carib entity is conducted by Carib-Bahamas; and all money in the Carib-Florida bank account is generated by the Bahamian business (DE # 189 at 31).  Based upon a consideration of the testimony and an examination of the exhibits in this case, the undersigned credits the testimony of Mr. Gamboa in this regard.  Neither Carib-Bahamas nor Carib-Florida has any employees; they have agents that work for the companies and are paid for their services, but they are not employees (DE # 189 at 5). The bank records reflect that prior to the formation of Carib-Florida, expenses related to a prior mid-2009 charter involving an unrelated vessel, the PAN AEGIS, initially were paid by Carib-Bahamas; but, after Carib-Florida was incorporated, expenses related to the same charter were paid out of the Carib-Florida account (PX's 90, 91).  Bank records of Carib-Florida also reflect that Eitzen was paid from Carib-Florida's accounts for both the charter of the GLEN and the charter of the SICHEM CHALLENGE (PX 87, DE #190 at 38-39).  In sum, as acknowledged by Carlos Gamboa in his testimony, the only function of Carib-Florida is to receive funds from or on behalf of Carib-Bahamas and pay moneys owed by Carib-Bahamas, and to disburse funds to or on behalf of Carlos Gamboa for personal use (DE # 189 at 31-32).

### 3. *Southport Maritime, Inc. ("Southport")*

Southport is in the business of making arrangements between vessel owners and businesses needing to charter vessels to transport goods.  Southport works with charterers from a variety of countries, some of which work through United States-based agents or offices (DE # 193 at 38-39).  Southport served as the broker for the parties to both charter agreements at issue in this case (DE ## 189 at 9; 193 at 9).  Southport has

done business with Carlos Gamboa and Carib Petroleum for many years, including the fixture of charter parties that pre-dated the formation of Carib-Florida.

### 4. *Tecnopetrol and Javier Bertucci*

Tecnopetrol is the exporter/shipper with respect to both of the charter parties at issue in this case (DE # 189 at 23). Javier Bertucci is the principal of Tecnopetrol, which produces Tecsol (PX # 97(a); DE # 189 at 23; JB[11] at 3). Tecsol is a degreaser solvent, and primarily manufactured as a base for paint, although it can be converted into many other uses (JB at 27-28). Tecnopetrol is responsible for obtaining the proper permits for export of its cargo from Venezuela (DE # 189 at 28).

### B.   The Procedures Regarding the Formation of the Charter Parties

The agreements or contracts between the parties with respect to chartering both vessels are known as charter parties. When the negotiations with respect to a particular charter party are finalized, a document is generated, which is known as a fixture recap. (DE # 193 at 39, 42; GR at 21).

The fixture recaps in the case at bar[12] incorporated by reference the provisions of a standard Tanker Voyage Charter Party form, which is known as the Asbatankvoy form (PX 3), and a Standard Tanker Chartering Questionnaire, known as form q88, which provides certain basic information regarding the vessel (PX 2 (GLEN) and PX 17 (SICHEM CHALLENGE); GR at 20, 24, 192-93; DE # 189 at 19). To the extent that specific provisions of the charter parties are relevant to the claims and defenses in this case, they are discussed *infra.*

---

[11]  The letters "JB" refer to the deposition testimony of Javier Bertucci, which was read at trial.

[12]  The fixture recap for the GLEN is PX 1; the fixture recap for the SICHEM CHALLENGE is PX 16.

Luis Tewes, for Southport, prepared the fixture recaps with regard to the charter parties at issue (DE ## 193 at 29; 189 at 12; GR at 18).  George Rozanovich, the general manager of the chartering department of Eitzen USA represented the relevant Eitzen entities in fixing the charters (GR at 12, 18, 112).  Eitzen has no written procedure for identifying the specific parties that charter the vessels that Eitzen owns or operates. Eitzen relies upon the tanker brokers, such as Southport, to vet charterers. This is the custom in the trade (DE # 188 at 76-77).

Mr. Gamboa represented Carib in fixing the charter parties at issue.  Southport was not aware of any distinctions among Carib entities--just that Mr. Gamboa represented Carib Petroleum Inc., generally (DE ## 193 at 19; 206 at 12).  Mr. Tewes' relationship with Carib was a by-product of an occasional business relationship over several years with Carlos Gamboa, which pre-dated the incorporation of Carib-Florida (DE # 193 at 24-5).

The only information Carlos Gamboa ever provided to Southport regarding Carib's incorporation, if any, was with regard to Carib-Bahamas.  Gamboa did not provide any information to Southport as to the existence of Carib-Florida (DE # 189 at 16).  Southport did not know whether there was more than one Carib entity, although Mr. Tewes knew that he was working with Carlos Gamboa through his Miami Carib office (DE ## 193 at 9; 206 at 20).

Eitzen acknowledged that Southport has knowledge superior to Eitzen as to the identity of the charterer (GR at 155).  Mr. Rozanovich, in fixing the charter on behalf of Eitzen, did not know specifically which Carib entity with which he was dealing (or even if there was more than one Carib entity) (GR at 21-23).

C.     The Facts Involving the Charter of the M/T GLEN

1.     *The Formation of the GLEN Charter Party*

Carlos Gamboa contacted Southport in approximately December 2009 to arrange to charter a tanker to transport Tecsol from Venezuela to either the Dominican Republic or to Cristobal, Panama (PX 1).  Luis Tewes, a Southport employee, contacted Mr. Rozanovich of Eitzen to determine whether Eitzen had a tanker available that could transport the cargo (DE # 193 at 28-29).

Southport vouched for Carib to Eitzen prior to the parties entering into the GLEN charter party.  Eitzen did not independently investigate Carib (GR at 19, 31).  Eitzen asked Southport to specifically identify the charterer in the fixture recap (GR at 19-20). The only charterer identified in the fixture, however, is the party "Carib Petroleum" (GR at 29-31).  The fixture recap, thus, does not specify which Carib entity is the charterer (PX 1).  Southport did not represent to Eitzen that Carlos Gamboa, individually, was the charterer, nor did Southport specify where Carib was incorporated, although Southport noted that the person who represented Carib was based in Florida (GR at 22).

The terms of the GLEN charter are represented by the fixture recap, which incorporates by reference both the Asbatankvoy form and the q88 for the GLEN (PX's 1, 2; GR at 20-21; DE # 189 at 17). According to the q88, which was not disputed at trial, the owner of the GLEN was Open Waters GLEN PTE Ltd., the technical operator was Columbia Shipmanagement Ltd., and Eitzen A/S was the commercial operator for the charter (GR at 20-21; PX 1).  Eitzen representative George Rozanovich confirmed at trial that the charter was between Open Waters GLEN PTE, Ltd. and Carib Petroleum, and that Eitzen A/S was not a party to the charter (GR at 21-23, 37).  Under the fixture recap, the

cargo to be transported is described as "Distillates – max 2 grades wvns[13] intended cargo is about 5,000 MT of Tecsol (Diesel without aromatics API abt 33)" (PX 1).

## 2. *Operation of The GLEN Charter Party*

Eitzen Chemical A/S was the commercial manager of the GLEN with respect to the claim in this case (DE # 188 at 7).  After the fixture of the GLEN by George Rozanovich, Eitzen USA had little involvement in the GLEN fixture. The post-fixture operation of the vessel was handled by Elsa Martinez, an employee of Eitzen A/S in Copenhagen, Denmark (GR at 53-55).  Although Luis Tewes was the Southport broker involved in in the initial brokering of the charter party, Michael Christiansen served as the representative of Southport in the operation of the GLEN charter (DE # 189 at 12, DE # 206 at 12-13).

Tecnopetrol declared that the substance loaded aboard the GLEN was "Tecsol solvent" (PX 5).  There were no issues regarding the loading of Tecsol on the GLEN in Venezuela.  The description of the cargo is not an issue with respect to the Plaintiff's claim for damages regarding the GLEN since the only claim is for demurrage.

Due to a delay in unloading the cargo in the Dominican Republic, Eitzen A/S made a claim for demurrage in the amount of $10,659.72.  Eitzen A/S was acting on behalf of the owner of the vessel in making this claim, although at the time of trial the owner itself had not yet made a claim for this demurrage amount (GR at 14).  Although this claim was disputed by Carib at the time it was made, and prior to trial, in closing arguments and in the post-trial briefing, Carib did not contest the amount of the demurrage owed, and therefore it is unnecessary to recite the manner of calculation (DE # 222 at 50-51).  The only dispute is whether Eitzen A/S is the proper party to bring this claim.

---

[13] The term "wvns" is an abbreviation for "within vessel's natural segregation," and this meant that the charter party allowed two grades of the distillate to be loaded into separate tanks of the vessel.

### D.    The Facts Involving the Charter of the M/T SICHEM CHALLENGE

#### 1.  *The Formation of the SICHEM CHALLENGE Charter Party*

Eitzen USA entered into a second charter party with Carib Petroleum in June 2010, as evidenced by the Fixture recap dated June 21, 2010 (PX 16).  The fixture recap does not specify which Carib entity is the charterer (PX 16).  As before, the broker was Southport, and fixture recap incorporates the terms of the Asbatankvoy form and the q88 for the SICHEM CHALLENGE (GR at 20, 24, 33-34; PX 16, 17, 3).  The q88 reflects that the registered owner was Eitzen Chemical (Singapore) PTE Ltd; that the technical operator was EMS Ship Management (Singapore) PTE Ltd; and, that the Commercial Operator was Eitzen Chemical USA (PX 17).  The cargo to be transported is described as "Distillates – max 2 grads wvns intended cargo is about 5,000 MT of Tecsol (Diesel without aromatics API abt 33)," which is the same as the description of the cargo transported by the GLEN (PX 16).  The expected laydays are described as "June 23 (06:00 hrs) – June 24, 2010." Demurrage is specified as US$10,000 per day, pro-rated (PX 16).

As with the GLEN, the Asbatankvoy form for charters was incorporated by reference as part of the charter party (PX 3).  This form includes Clause 19, which contains an exception to liability under certain circumstances, as follows:

> 19.    GENERAL EXCEPTIONS CLAUSE. . . . [N]either the vessel nor Master or Owner, nor the Charterer, shall, unless so otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:--Act of God; act of war; perils of the sea; act of public enemies, pirates or assailing thieves; arrest of restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

The Defendants have relied, *inter alia*, upon the above restraint of princes exception to absolve them from liability in this case.

2.   *The operation of the SICHEM CHALLENGE CHARTER PARTY*

a.  General Background

The evidence reflects the following general background regarding the export of products from Venezuela.  The Venezuelan government has export controls for certain products and has the ability to regulate exports (DE # 189 at 21-22).  This includes the ability to stop cargo loading if a person attempts to export a product without proper export permits (DE ##  189 at 23; 193 at 16).  A common practice for the Venezuelan government is to seize a vessel in connection with criminal investigations of smuggling on the suspicion that the vessel is an asset of the smuggler.  The detention commonly lasts for a significant period of time (DE # 191 at 132-33).  Port operations at Puerto Cabello, the port where the SICHEM CHALLENGE was to receive its cargo, were nationalized by the Venezuelan government in 2009 (DE # 191 at 128).  Cargo cannot be loaded on a vessel in Puerto Cabello until the cargo has been approved by Venezuelan customs officials at the port (DE # 191 at 128-29).

b.  The Timeline of Events at Puerto Cabello

The evidence at trial established the following timeline with respect to the arrival of the SICHEM CHALLENGE in Venezuela until its departure.  This detailed timeline is set forth to support the ultimate finding that the Plaintiff used due diligence in its attempts to have the cargo and vessel released; and, that the Plaintiff did not fail to mitigate its damages as claimed by the Defendants.

i.      The cargo destined for the SICHEM CHALLENGE cleared Venezuelan customs after its review of the cargo and export documentation, similar to other instances when Tecnopetrol had exported Tecsol (JB at 10-12).

ii.      On June 29, 2010, the vessel berthed in Puerto Cabello at a terminal controlled by Ocamar Agencia Naviera (RK at 8, 10)[14].  After the vessel berthed, Ocamar authorities, dressed in military uniforms and referring to themselves by military rank, came aboard to review documentation with vessel crew as to the cargo to be loaded (RK at 12-14).

iii.     On June 30, 2010, loading of the cargo began early in the morning (RK at 58).  The National Guard took samples of the cargo during the first couple days of loading, and the vessel took its own samples at the same time (RK at 63-64).

iv.     On the night of July 2, 2010, at 8:18 p.m., loading of the cargo onto the SICHEM CHALLENGE was halted by the Venezuelan National Guard (PX # 26; RK at 28, 33, 65, 137).  The subsequent detention of the SICHEM CHALLENGE occurred as a result of a Venezuelan prosecutor's office's authority to detain the vessel (DE # 191 at 14).  No reason was given when loading was halted or immediately thereafter (RK at 65, 66-67).  Mr. Bertucci, the shipper/exporter, claims that cargo loading ceased when he refused to pay a bribe to a military official who supervises the port (JB at 10-12).

v.      For several days, the vessel inquired as to why cargo loading had been halted and why the vessel crew could not leave the ship, but the vessel received no answers (RK at 35).

vi.     About July 5 or 6, 2010, the Venezuelan National Guard took another set of cargo samples (RK at 74-75).

vii.    On about July 6, 2010, members of the crew, except for the vessel captain, were allowed to go ashore (RK at 35).  A day or two later, the captain was allowed to go ashore as well (RK at 35-36).  Agents that visited the vessel during this time period reassured the captain that the matter would get resolved (RK at 37).  During this time

---

[14]  The letters "RK" are used to designate the deposition testimony of the vessel master, Roney Kuruvilla, that was read into the record at trial.

period, National Guard agents took samples of the vessel's cargo.  Vessel crew members concurrently took their own samples (RK at 38).

  viii. On July 9, 2010, Eitzen's protection and indemnity ("P&I") insurance correspondent, Jose Sabatino, was first contacted  to try to resolve the issues (DE # 191 at 8-9).

  ix. On July 12, 2010, Mr. Sabatino (through his firm, Globalpandi) was officially retained as the P&I correspondent for the dispute (DE # 191 at 115-16, 119, 131).  Mr. Sabatino was charged with investigating the ship's detention in an effort to have the ship released (DE # 191 at 10).  Mr. Sabatino's initial investigation uncovered that PDVSA, the Venezuelan government entity responsible for regulating Venezuelan oil exportation, had tested the cargo on the CHALLENGE and claimed that it was a diesel fuel without a requisite export permit, not Tecsol.  Thus, the government initiated a smuggling investigation and prohibited the vessel from sailing (DE # 191 at 10-12).

  x. On July 12, 2010, a formal prohibition was issued that forbade the SICHEM CHALLENGE from leaving the port (DE # 191 at 11).  The government apparently prohibited the vessel's sailing in conjunction with its investigation of Javier Bertucci, believing that the vessel was an asset of Bertucci or Tecnopetrol (PX # 31; DE # 191 at 11).  Mr. Sabatino's primary purpose, thus, was to disassociate in the minds of the Venezuelan prosecutor's office the vessel cargo from the vessel owner (DE # 191 at 14).  He was not focused on determining the exact product at issue aboard the SICHEM CHALLENGE (DE # 191 at 121-3).

  xi. On July 15 or 16, 2010, Mr. Sabatino received a power of attorney from the vessel master, which allowed Mr. Sabatino to formally approach the prosecutor's office in charge of the investigation (DE # 191 at 14, 120).  Without a power of attorney, there was not much Mr. Sabatino could do on behalf of the vessel (DE # 188 at 90).  At that point, Mr. Sabatino requested from the insurance company a copy of the charter party

(DE # 191 at 120).  When initially retained, Mr. Sabatino did not immediately seek a copy of the charter party because, without a power of attorney, Mr. Sabatino was unable to gain access to sufficient information from the prosecutor's office to determine the scope and basis of the prosecutor's investigation (DE # 191 at 120).

xii.    On July 21, 2010, Mr. Sabatino filed a petition with the prosecutor's office attempting to establish that the vessel was not an asset of Javier Bertucci or Tecnopetrol (DE # 191 at 15).

xiii.   On July 22, 2010, Mr. Sabatino received a copy of the charter party from the insurance company (DE # 191 at 15, 119).  He then ordered a translation of it into Spanish (DE # 191 at 120).  The vessel master spoke occasionally with Mr. Sabatino during the incident (RK at 122-23).  Mr. Sabatino never requested a copy of the charter party from the vessel master, who could have requested it from Eitzen (RK at 114).

xiv.    Through July 23, 2010, Carib expressed that it was working to resolve the detention of the SICHEM CHALLENGE, but advised Eitzen that Eitzen's P&I representative in Puerto Cabello, Mr. Sabatino, was better positioned to resolve the matter.  Carib also suggested that all parties join in calling for the cargo to be discharged if loading could not be completed by July 28, 2010 (PX # 50).  There is no evidence that Carib ever helped solicit the Venezuelan prosecutor's office for release of the vessel.

xv.     On July 28, 2010, Mr. Sabatino received a translation of the charter party and submitted it to the prosecutor's office (DE # 191 at 120).

xvi.    On approximately July 29, 2010, Carib advised Eitzen, through Southport, that Carib believed it could do little to secure the vessel's release, with or without cargo, and that Eitzen was in a better position (through its local representative) to do so.  Carib further advised that its position was to discharge the cargo (PX # 73).

17

xvii.    On August 2, 2010, the SICHEM CHALLENGE was moved from the terminal to a nearby anchorage to make room at the terminal for another vessel, but the SICHEM CHALLENGE remained under port authority (DE # 191 at 19; RK at 39-40).

xviii.    As of August 2, 2010, Carib was still hopeful that the SICHEM CHALLENGE would be able to sail with the cargo, but again advised Eitzen that, if that were not possible, the vessel's representative should demand release of the vessel.  Prior to this date, Eitzen advised Carib that Eitzen's representative had demanded release of the ship without getting a response, and that a joint petition to the prosecutor's office with Tecnopetrol's attorney, Dr. Luis Melendez, might be helpful (PX # 39).  Carib was not responsive to requests to more actively attend to matters in Venezuela (TS at 55-56).

xix.    At the beginning of August, Mr. Sabatino contacted Mr. Bertucci's (and Tecnopetrol's) lawyer, Dr. Melendez.  The two met on August 8, 2010, to discuss the details of the ongoing investigation (DE # 191 at 17).  Mr. Sabatino's purpose for the meeting was to encourage Dr. Melendez to jointly petition the prosecutor's office to establish that the vessel was not an asset of Javier Bertucci or Tecnopetrol (DE # 191 at 17).  Mr. Sabatino found Dr. Melendez, who deferred to his client, uncooperative (DE # 191 at 38-9).

xx.    On about August 10, 2010, during the SICHEM CHALLENGE's time in anchorage, the Venezuelan Coast Guard visited the vessel with government lawyers and others to obtain more cargo samples.  The officials advised the captain that the detention would continue for another week or two.  They further advised the captain that the vessel would likely have to discharge the cargo before departing (RK at 40-42).

xxi.    During the vessel's time at anchorage, it returned to the terminal only once, for about a day, to exchange fresh provisions and supplies (RK at 45).

xxii.    On August 20, 2010, in response to the petition by Mr. Sabatino, the prosecutor's office entered an order that the cargo could be discharged from the SICHEM

18

CHALLENGE and trucked to a storage facility called Quimisol (DE # 191 at 28, 35-6). The vessel captain received this notice from a government attorney who advised that the vessel could depart following discharge of the cargo (RK at 42).

xxiii.   From August 20 to August 27, 2010, Mr. Sabatino arranged the logistics for discharging the cargo. On August 27, 2010, the discharge of the cargo commenced (DE # 191 at 36, 28).

xxiv.   On about August 30, 2010, the Venezuelan prosecutor's office determined, in response to Mr. Sabatino's petition, that the SICHEM CHALLENGE could be released and allowed to sail (DE # 191 at 16, 37). The release order was entered on August 31, 2010 (DE # 191 at 16).

xxv.   By September 2, 2010, the cargo was discharged, and the SICHEM CHALLENGE left the port the following day (DE # 191 at 16, 37; RK at 44).

xxvi.   Eitzen acted diligently in attempting to procure the release of the vessel through the efforts of Jose Sabatino, the representative of its insurer. Carib, however, provided minimal effort to secure the release of the vessel, and throughout most of the delay Carib agreed with efforts to secure the release of the cargo as well as the vessel. This is evidenced by the three payments each in the amount of $50,000.00 made by Carib for demurrage, as well as the evidence that at least as late as August 2, 2010, Carib was still hopeful that the cargo would be released. Based upon the above events, and considering the testimony as a whole, the undersigned finds that Eitzen did not fail to mitigate its damages.

### c. Damages Claimed By Eitzen

The undersigned credits the testimony of Caspar Cleemann regarding the amounts claimed by Eitzen that were incurred and paid during the time the SICHEM

CHALLENGE was at Puerto Cabello, to secure the release of the vessel.[15]  The following is a description of those damages.

   i.  The total amount due for freight charges under the terms of the charter party was $130,000.00; and Eitzen prepaid $55,000.00 of this amount, leaving a balance of $75,000.00.  (DE # 188 at 20).

   ii.  Eitzen also claims damages based on the delay in lay time.  Specifically, Eitzen claims demurrage at the rate of $10,000.00 per day, as specified in the fixture recap, for the period of time between June 23, 2010 through July 2, 2010 (PX 58, DE # 188 at 18).  Demurrage is liquidated damages for normal delays exceeding the lay time in loading and unloading operations (DE # 188 at 29).   In this case, the amount of demurrage claimed was $72,833.33 for 7 days, 6 hours and 48 minutes (PX 58).  Eitzen also claimed unliquidated damages resulting from detention of the vessel, which Eitzen's representative, Mr. Cleemann, testified at trial was damages for abnormal delays, such as where the charterers are "frustrating the charter party or if they're in breach of their obligations under the charter party."  (DE # 188 at 29).   Eitzen sought damages in the amount of $11,000.00 per day as damages for detention based on what it estimated was the market rate for the loss of the use of the ship (DE # 188 at 29-30).  Mr. Cleemann acknowledged, however, that frequently the detention rate was calculated at the same rate as the demurrage rate (DE # 188 at 30).  The total amount of these damages was $682,814.00 based on the delay from July 2, 2010 to September 3, 2010, specifically for 62 days, 18 hours and 32 minutes (PX 58, DE # 188 at 20).  The undersigned finds that the appropriate rate for detention of the SICHEM CHALLENGE would be $10,000.00 per day since the basis for increasing this rate was not persuasive.  Thus, taking into account this reduction, the total amount attributable to detention delay, for which Eitzen could

---

[15]  In making this determination, the undersigned recognizes that the Plaintiff failed to introduce documentary evidence to substantiate the fact that such payments were made; nevertheless, Mr. Cleemann's testimony was credible and persuasive.

reasonably seek compensation, is $627,722.22.  Thus, the total amount due for delay

time, if recoverable by Eitzen, is $700,555.55.[16]  Carib paid Eitzen a total of $150,000.00 in

demurrage based on the delay (DE # 188 at 20-21).  Therefore, the total amount due for

delay under the terms of the charter party for demurrage and for detention is $550,555.55.

     iii.  The SICHEM CHALLENGE incurred various costs associated with its stay in

Puerto Cabello, which were all paid by Eitzen, and for which Carib-Bahamas was

responsible under the terms of the charter party.[17]  These costs, which are described

---

[16]  This amount is $5,069.45 less than what was claimed by Eitzen Singapore due to a difference in the calculation of damages resulting from delay, which the undersigned computed based on the testimony to be a delay of 70 days, 1 hour and 20 minutes, as opposed to the calculation by the Plaintiff of 70 days, 13 hours and 30 minutes.  The Defendants  post-trial memorandum did not address the calculation of the amount of delay.

[17]  As stated above, the charter agreement  and fixture recap incorporates the ASBATANKVOY charter party form.  Clause 10 of the form states:

> PUMPING IN AND OUT.  The cargo shall be pumped  into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall  apply against  allowed laytime.  The Vessel shall supply her pumps and the necessary power for discharging all ports, as  well as necessary hands. However, should the Vessel be prevented  from supplying  such power by  reason  of regulations prohibit fires on board, the Charterer or consignee shall supply, at his expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes.  If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the charter, providing the Vessel has facilities for generating steam and is permitted to have fires on board.  All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

> Clause 12 of the ASBATANKVOY charter party form provides:  "The vessel shall be free of charge for the use of any wharf, dock, place or mooring facility arranged by the charterers for the purpose of loading or discharging cargo ...."

> Clause 23 of the ASBATANKVOY charter party form provides:  "Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder."

below, total $266,429.19.  Eitzen paid the agent, Servicios Navieramar, a fee of $19,624.00 for the original loading of the cargo; $17,858.00 for resupply of bunkers[18]/fresh water, and discharge of slops; and $14,439.00 for discharge of the loaded cargo (PX 58; DE # 188 at 23).  In addition, Eitzen paid $135,311.51[19] in additional bunker consumption from July 2, 2010 to September 3, 2010 (PX's 58, 61; DE # 188 at 24-25).  Mr. Cleemann explained credibly that this fuel consumption was necessary to keep the vessel ready to leave port when permitted to do so (DE # 188 at 26-27).  In addition, Eitzen was required to arrange for the discharge of the cargo before the vessel was permitted to sail (DE # 188 at 27-28).  This required the payment of $67,460.93 for truck rental and associated transportation costs expended during the discharge of the cargo, as well as $11,735.75 for the necessary hoses, personnel, and equipment costs expended during the discharge of the cargo  (PX's 58, 62; DE # 188 at 27-28).

### 3.    The Cargo Aboard the SICHEM CHALLENGE

Mr. Gamboa consistently communicated to Mr. Tewes that he sought to transport Tecsol, which Mr. Gamboa described as a solvent, and, for transportation purposes, like a diesel without aromatics (DE # 193 at 14, 30-32).  Likewise, Roney Kuruvilla, the vessel master, expected to be loading Tecsol, also referred to as diesel without aromatics (RK at 11, 15, 18, 23).  The vessel master prepared the notice of readiness ("NOR," DE # 188 at 44) to present to Ocamar at the terminal in Puerto Cabello based upon two orders the vessel master had received from Ty Shimada.  One order referred to the cargo as Tecsol, and parenthetically as diesel without aromatics; and another order simply referred to the product as Tecsol.  The vessel master prepared a Notice of Readiness ("NOR") that

---

[18]  "Bunkers" is the term used to refer to the amounts of oil necessary for the operation of the vessel.

[19]  The undersigned reduced the amount claimed for bunkers by $30.00 based upon the testimony of Mr. Cleemann, due to an apparent mathematical error in the computation provided by the Plaintiff.

described the cargo as "Tecsol (Diesel)," based upon his own synthesis of the two orders he had received (RK at 98-100, 138-39; PX # 21).  Later, Ty Shimada asked the vessel master to prepare a second NOR that described the cargo simply as Tecsol, which the vessel master prepared and presented to Ocamar (RK at 100-101).  A man named Alex who supervised loading of the cargo had also made this request of the vessel master (RK at 153-54).  Someone (unidentified) suggested to the vessel master that the problem in port may have arisen because of the vessel master's synthesized description of the cargo on the original NOR (RK at 138-39).

None of the vessel crew observed the cargo at the time of loading to be anything other than as described in the charter party (TS at 117; RK at 59-60).  Generally, a vessel will check documentation prior to loading to ensure that the expected cargo is being loaded on the vessel, and take samples around the time of loading to ensure that the quality of the product does not change during the voyage.  The vessel owner, however, is not actively engaged in determining whether a cargo is illegal for export (GR at 63-75).  The nature of the shipping industry requires moving forward with business transactions relying on a fair amount of trust among parties in order to conclude the transactions (DE # 193 at 50).  In this instance, the vessel took samples of the cargo as it was being loaded and visually inspected the cargo, finding it generally consistent with diesel (RK at 59-60).  The purpose of the visual inspection is simply to see if the cargo is generally consistent with the expected cargo (RK at 60-61, 62-63).

There are two reports that analyze the cargo samples taken by the Venezuelan authorities.  The first report, dated July 2, 2010, includes a description of results and a statement that "the samples comply with the specifications of a national diesel." (PX 76).  A second report, dated October 5, 2011, provides a detailed analysis, but in scientific jargon that does not comprehensibly explain whether the samples are Venezuelan national diesel fuel (PX 76A).  For example, the second report concludes, "The results

obtained indicate a complex mixture of hydrocarbons of different molecular weights, including paraffins, aromatics and napthenics typical of intermediate products deriving from distillation of petroleum, with a significant proportion of light compounds.   The chromatographic profiles suggest that the samples analyzed correspond to a mixture of at least two fractions of petroleum distillate, with a heavier diesel-type majority fraction predominating over a smaller fraction rich in solvent-type light components."  (PX 76A).

It was common knowledge in the industry that those exporting diesel products out of Venezuela at the time of the GLEN incident needed government approval to do so (DE # 193 at 16).

Carlos Gamboa testified that he believed that he (through Carib) was buying Tecsol from Tecnopetrol/Javier Bertucci (DE # 189 at 23).  Mr. Bertucci represented to Mr. Gamboa in an email dated August 27, 2008, that he had obtained the requisite permits to export Tecsol (PX # 97(a); and Carlos Gamboa testified that he believed that Tecnopetrol had licenses to export Tecsol from Venezuela (DE # 189 at 26-7).

In August 2008, Javier Bertucci explained to Carlos Gamboa by email that, while he had all the necessary permits to export Tecsol, in Latin America you "have to grease the palms," i.e., pay bribes (PX # 97(a)).  Carlos Gamboa understood that bribes were generally necessary (DE # 190 at 43).  Javier Bertucci admitted that he had previously paid bribes to the same person who allegedly requested a bribe in the instance of the SICHEM CHALLENGE in order to get his product through the port, as well to others in other departments that manage the port.  Bertucci, however, contended that, with the SICHEM CHALLENGE, the official's request was for a significantly greater amount than usual (JB at 35-36).

Javier Bertucci testified that Tecnopetrol had successfully exported its product, after obtaining the proper permits, through Puerto Cabello to the Dominican Republic in

24

a shipment in 2008 on board the vessel PUNTA BLANCA, and also in 2009 on board the GLEN (JB at 5-7).

The events surrounding the transportation of cargo by the GLEN are circumstantially relevant to the identification of the cargo on board the SICHEM CHALLENGE since Javier Bertucci testified that this was the same product that was transported on board the SICHEM CHALLENGE.  There were three Bills of Lading issued with respect to the cargo shipped on the GLEN (PX's 10, 11, 12).  On December 22, 2009, Gamboa called Michael Christiansen of Southport and told him to issue a bill of lading for the GLEN that altered the original issued in Venezuela by Tecnopetrol's agent. The cargo had initially been described as "TECSOL" or an "industrial degreaser" with the consignee listed as Avalon Petrochemical. (PX 10).  Upon discharge of the cargo in the Dominican Republic, the description had changed and the cargo was identified as "One Lot Fuel No 2 (Diesel) in Bulk" with the consignee changed to Maxon Engineering (PX 12).  The vessel ullage reports, both before and after discharging in the Dominican Republic stated the product was "diesel" and Tecsol was not mentioned (PX 7, DE # 189 at 34-35).  Carlos Gamboa testified that the cargo was referred to as diesel when it arrived at the Dominican Republic because it was going to be blended into a diesel, and therefore it was imported as a diesel (DE # 189 at 34-36).  Gamboa testified that there are many similarities between Venezuelan national product diesel oil and Tecsol.  Tecsol can be used as a degreaser solvent, which is a distillate.  Gasoline and diesel oil could also be used for this purpose (DE # 190 at 7).  Conversely, according to Javier Bertucci, Tecsol could be used as fuel in an engine, although it is not designed for that purpose (JB at 16-17). Carlos Gamboa consistently asked those involved in the various charter parties to avoid referring to Tescol as diesel without aromatics (DE # 190 at 48).

The presence of multiple bills of lading describing the cargo differently was not a concern to the vessel owner  since "diesel," "solvent" and "Tecsol," were all products

that the vessel was permitted to transport (DE # 188 at 99-101). Eitzen Chemical USA never inquired (before fixing the two charter parties at issue here) as to the specifics of the product Carib sought to transport, or Carib's description of the cargo (DE ## 193 at 37; 206 at 18, 25).

Criminal proceedings are underway in Venezuela against Mr. Bertucci regarding the alleged smuggling of Venezuelan national diesel fuel, in connection with the incident involving the SICHEM CHALLENGE only. No finding has yet been made (DE # 191 at 113-15, 141-42; JB at 13).

Based on the totality of the circumstances, the undersigned finds that Plaintiff has proven by a preponderance of the evidence that the cargo loaded onto the SICHEM CHALLENGE was Venezuelan national diesel that Carib-Bahamas was attempting to smuggle out of Venezuela without the proper permits. The test results from PDVSA alone, albeit conclusory in nature, establish this fact by at least a preponderance of the evidence (PX 76). Moreover, these results are corroborated by the fact that the cargo aboard the GLEN was imported into the Dominican Republic on a bill of lading that was changed from the description TECSOL as an "industrial degreaser" to "One Lot Fuel No. 2 (Diesel) in Bulk" (PX's 10, 11, 12). The claim by Carlos Gamboa that he changed the description in the bill of lading for the GLEN because he intended to blend it after importation is simply not credible. Although the test results of the second test of cargo samples performed at the request of the Venezuelan officials are not clear since they do not specifically render an opinion regarding whether the cargo was Venezuelan national diesel, those results tend to corroborate the conclusion of the first test since the majority fraction of the cargo was "a heavier diesel-type." (PX 76A). Moreover, the defendants provided no expert testimony to contradict the evidence that Venezuelan national diesel was the cargo on board the SICHEM CHALLENGE.

Finally, the undersigned finds that Carlos Gamboa knew of the nature of the cargo he was exporting.  Aside from his repeated instructions that "diesel" should not be included on the bills of lading, and his directions to change the description of the cargo of the GLEN after it left Venezuela and prior to importation into the Dominican Republic, he was responsible for selling the cargo, and as a matter of common sense he had to know what he was selling.  This is particularly true since he had previously exported and sold the same cargo obtained from Tecnopetrol.

III.   **CONCLUSIONS OF LAW**

Based upon the above findings of fact, the undersigned makes the following conclusions of law.

A.   **Jurisdiction**

Pursuant to 28 U.S.C. § 1333, this Court has admiralty jurisdiction over this case, which is governed by the federal maritime law.  *Sea Lane Bahamas Ltd. V. Europa Cruises Corp.*, 188 F.3d 1317, 1320 (11th Cir.  1999) (where breach of charter agreement forms gravamen of complaint, case falls within district court's admiralty jurisdiction), *citing Kossick v. United Fruit Co.,* 365 U.S. 731, 735  (1961).

B.   **The GLEN**

1.   Eitzen A/S as the commercial operator of the GLEN, is in the position of a bailee and is entitled to bring the claim for demurrage, despite the fact that it was not a formal party to the charter party contract.

The Defendants contend that Eitzen A/S cannot maintain this action since it is not the real party in interest and does not have standing to pursue a claim based on the breach of a contract to which it is not a party.  Plaintiffs counter that Eitzen A/S is entitled to maintain this action in its own name since it is in essence a de facto party to the

27

contract based on its role as commercial operator in entering the charter party, and as a bailee of the vessel.[20]

Federal Rule of Civil Procedure 17(a)(1) provides that "[a]n action must be prosecuted in the name of the real party in interest."   The rule also provides, however, that certain persons or entities "may sue in their own names without joining the person for whose benefit the action is brought," including "a bailee" and "a party with whom or in whose name a contract has been made for another's benefit." [21]

Bailees were added as parties who could sue in their own name in the 1966 amendments to Rule 17.  The 1966 Advisory Committee notes explained the reason for this as follows:

> The rule adds to the illustrative list of real parties in interest a bailee--meaning, of course, a bailee suing on behalf of the bailor with respect to the property bailed. (When the possessor of property other than the owner sues for an invasion of the possessory interest he is the real party in interest.) The word "bailee" is added primarily to preserve the admiralty practice whereby the owner of a vessel as bailee of the cargo, or the master of the vessel as bailee of both vessel and cargo, sues for damage to either property interest or both.

---

[20]   At the conclusion of the evidence, Defendants moved to dismiss Count I of the Complaint regarding the demurrage claim with respect to the GLEN on the grounds that Eitzen A/S, the commercial operator of the vessel, was not the real party in interest, and that the only entity that could bring such a claim was the owner of the GLEN as identified on the form q88, Open Waters Glen PTE, Ltd.  The undersigned deferred ruling on this motion, and permitted the parties to file written briefs on this issue, which they did (DE ## 209, 212).  The motion is denied based on the analysis contained in this Order.

[21]   Defendants also claim that Eitzen A/S lacks standing to bring its claim.  In the case at bar, the inquiry regarding whether the Plaintiff  is the real party in interest under Rule 17(a) and whether the Plaintiff has standing is the same, and neither party has provided an independent legal analysis of standing apart from the Rule 17(a) argument.  To establish standing, a plaintiff must allege an "(1) injury-in-fact (2) fairly traceable to the defendant's actions and (3) likely to be redressed by a favorable decision. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 (1982)."  *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 319 (5th Cir. 1999).  A plaintiff who has the right to bring suit as a real party in interest, who is claiming money damages, has presented an "injury in fact" sufficient to confer standing regardless of the merits of the claim.  *See, e.g. Construction Industry Retirement Fund of Rockford, Ill. v. Kasper Trucking, Inc.,* 10 F.3d 465, 467 (7th Cir. 1993).

Failure to join the real party in interest does not, however, always mandate dismissal.  Rule 17(a)(3) provides,  "The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest."  The 1966 Advisory Committee notes explain the reason for this provision as follows:

> The provision that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed, after the objection has been raised, for ratification, substitution, etc., is added simply in the interests of justice. In its origin the rule concerning the real party in interest was permissive in purpose: it was designed to allow an assignee to sue in his own name. That having been accomplished, the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.

Plaintiff Eitzen Chemical A/S contends that since the defendant stipulated that it was the commercial operator of the vessel, that the identity of the proper party was deemed stipulated and required no proof at trial (DE # 209 at 3).  The Plaintiff emphasizes that, as the commercial operator, it had the authority to enter into the charter agreement and make binding decisions regarding the vessel (DE # 209 at 3).  The Plaintiff asserts that the pretrial stipulation established that the Defendants did not challenge its right to bring this lawsuit since they stipulated that Eitzen A/S was the commercial operator who entered into the charter agreement (DE # 209 at 5).

Defendants, on the other hand, contend that they always challenged the standing of Eitzen A/S to bring this lawsuit as the real party in interest; and contend  that there was no evidence presented at trial that Eitzen A/S was authorized by the owner of the vessel to bring this claim.

The undersigned notes that this issue was raised as an affirmative defense in their answer; the issue was identified in the pretrial stipulation (DE # 144 at 13, ¶¶ 6(W) and 6(X); at 14, ¶ (8)(F);  and the Court's Order on the pretrial stipulation expressly identified as an issue the affirmative defense that "Eitzen Chemical A/S lacks standing on Count I, not a property party or real party in interest" (DE # 150 at 3, ¶ 4).[22]

The undersigned is constrained to agree with the Defendants that, despite the vague language in the pretrial stipulation, it is clear from the Pretrial Order that the Defendants always challenged the right of Eitzen A/S to pursue its claim regarding the GLEN in its own name.  Moreover, although Eitzen A/S had the authority to make decisions regarding the operation of the GLEN, there is no evidence that it had the express authority from the owner to bring a lawsuit.  The pool agreement under which Plaintiff operated the GLEN was not introduced into evidence, and none of the witnesses were able to testify regarding the exact terms of this agreement.  Although, as stated in the pretrial stipulation, Eitzen A/S negotiated the charter of the GLEN, and in that sense entered into the agreement, these actions were taken on behalf of the owner; specifically, as the unequivocal testimony at trial of Eitzen's employees established, Eitzen A/S entered into the contract in the name of the owner of the vessel.  Therefore, the owner of the vessel, not Eitzen A/S, was the party to the charter agreement.  There is simply insufficient evidence to establish that Eitzen was the party to the contract or that the owner of the vessel had assigned its rights to bring a lawsuit to Eitzen A/S.  Finally,

---

[22]   To the extent that Eitzen relies on the language in the pretrial stipulation that "Eitzen A/S was the commercial operator of the M/T GLEN who contracted with the charterer under the fixture recap attached to the Second Amended Complaint," that reliance is misplaced since the Pretrial Order clarified that the Defendants were maintaining their affirmative defense that Eitzen was not the real party in interest and did not have standing to maintain this lawsuit; and the stipulation does not directly contradict the position of the Defendants that Eitzen did not have the authority to sue, rather it can be construed to mean that Eitzen A/S was the entity that was acting on behalf of the owner for the purpose of entering into the contract; but the evidence, including the fixture recap and the testimony of Eitzen's employees, is uncontradicted that the owner of the GLEN was the party to the contract and that Eitzen was not.

although the objection that Eitzen A/S was not the real party in interest and did not have

standing to maintain this action was raised repeatedly--as an affirmative defense, in the

pretrial stipulation, at the pretrial conference, in opening statements, during the trial, and

in the post-trial memorandum--there was no request to substitute the owner as the

plaintiff, and there was no evidence presented that the owner, Open Waters Glen, PTE,

Ltd. ratified this lawsuit.  Thus, the undersigned rejects the Plaintiff's argument that it

was the party to the contract, and as such, has the right to bring this lawsuit.

This does not end the matter, however, since the Plaintiff also claims that it has

the right to pursue this lawsuit in its own name as the bailee of the vessel.  In its

Memorandum of Law in Opposition to Defendants' Rule 52(c) Motion as to the Real Party

in Interest (DE # 209 at 10), the Plaintiff correctly points out that a bailment may be

created both by contract and by operation of law based on the facts.  "It is the element of

lawful possession, and the duty to account for the thing as the property of another, that

creates the bailment, whether such possession results from contract or is otherwise

lawfully obtained. …Taking lawful possession without present intention to appropriate

creates a bailment."  *Seaboard Sand & Gravel Corp. v. Moran Towing Corp.*, 154 F.2d 399,

402 (2d Cir. 1946).

In the case at bar, even though the specific terms of the pool agreement under

which the GLEN was operated by Eitzen A/S were not presented to the Court, the

evidence clearly established that Eitzen A/S was the commercial operator to whom the

vessel was entrusted for the purpose of making all decisions regarding the operation of

the vessel, including entering into contracts on behalf of the owner.  Eitzen A/S was

therefore the bailee of the GLEN.

Since Eitzen A/S was the bailee of the GLEN, it is entitled to pursue the claim for

demurrage in its own name.  "The underlying rational for the inclusion of the reference to

"bailee" [in Rule 17(a)] is that someone in possession of property who sues for an injury

31

to the property is the real party in interest even though that person may not be the owner of the goods."  Wright, Miller & Kane, 6A Fed. Prac. & Proc. Civ. § 1548 (3d ed.) (2016). As the Advisory Committee Notes indicate, the vessel itself as well as the goods which it carries, may be the subject of bailment.

In the case at bar, Eitzen A/S was the bailee of the vessel since the vessel was entrusted to it for all purposes.  Therefore, the demurrage owed as a result of the delay in offloading the vessel can be claimed by Eitzen A/S as the bailee.  The objectives of Rule 17(a) to protect the Defendant from dual liability is satisfied in this case since any suit by the owner/bailor will be barred.  *Prevor-Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Mgmt., Inc.*, 620 F.2d 1, 3-5 (1st Cir. 1980); *The Vale Royal*, 51 F. Supp. 412, 423 (D. Md. 1943).[23]

2.  Plaintiff Eitzen A/S is entitled to a judgment in the amount of $10,659.72 against Defendant Carib Petroleum, a Bahamian corporation, as damages for demurrage.

The amount of demurrage owed for the delay in offloading the GLEN is $10,659.72, and Plaintiff Eitzen A/S is entitled to judgment against Carib-Bahamas in this amount. For the reasons discussed below, however, Defendants Carib-Florida and Carlos Gamboa are entitled to judgment on this claim on the grounds that Plaintiff Eitzen A/S has failed to establish that Carib-Bahamas and Carib-Florida are alter egos, or that the corporate veil of Carib-Bahamas should be pierced to hold Carlos Gamboa individually liable on the contract.

---

[23]  In addition to the rule that suit by the bailor will be barred based on the judgment entered in favor of the bailee, in the case at bar the Defendants will also be protected by the expiration of the statute of limitations.

C.      **The SICHEM CHALLENGE**

**1.  Carib-Bahamas is liable under the terms of the charter party for the damages resulting from the delay at Puerto Cabello and the seizure of the SICHEM CHALLENGE by Venezuelan authorities.**

As set forth in the above findings of fact, Eitzen Singapore incurred various expenses which, under the terms of the charter party were required to be paid by Carib-Bahamas.  These expenses, which include damages based on delay in the amount of $550,555.55, and the charges incurred in unloading the cargo and paying the various port charges incurred during the delay and in securing the release of the vessel in the amount of $266,429.19, as well as the unpaid portion of the freight charges in the amount of $75,000.00.  Eitzen Singapore therefore is entitled to recover a total of $891,984.74 from Carib-Bahamas.

**2.  The restraint of princes exception to liability does not relieve Carib-Bahamas from liability.**

Under the terms of the Asbatankvoy charter form regarding a general exception from liability, a charterer such as Carib-Bahamas could be relieved of liability under the restraint of princes doctrine for damages not otherwise specified in the charter party if it proved that the damages resulted from the seizure of the cargo by a governmental authority, such as the Venezuelan government.  *See M&Z Trading Corp. v. Hecny* Group, 41 F. App'x 141 (9th Cir. 2002) (construing analogous provision in Carriage of Goods by Sea Act ("COGSA"), 46 App. U.S.C. § 1304(2)(g)); *Sedco , Inc. v. S.S. Strathewe*, 800 F.2d 27, 33 (2nd Cir. 1986) (same); *Lekas & Drivas, Inc. v. Goulandris,* 306 F.2d 426, 430 (2nd Cir. 1962) (same); *M.O.H. of West Indies, Inc. v. Christoffer Hannevig, Inc.*, 264 F. 311 (2nd Cir. 1919) (construing similar provision of applicable charter party to hold that restraint of princes applied to excuse damages resulting from detention of vessel due to government's refusal to grant clearance); *In the Matter of the Arbitration between SA*

33

*Marine Corp. S.A., as Disponent Owners of the M/V ENERGY RANGER and CANFORNAV*

*LIMITED as Charterers Under a NYPE Form of Time Charter dated January 23, 2002,* No.

3817, Society of Maritime Arbitrators, Inc. (Dec. 17, 2003) (applying the restraint of

princes exception contained in time charter with provision analogous to the Asbatankvoy

form to detention of ship based on search for drugs).

Once a defendant establishes that it falls within the restraint of princes exception,

the burden of proof shifts to the plaintiff to prove that the cause of the restraint was the

fault of the defendant, either by negligence or otherwise.  *See Republic of France v.*

*French Overseas Corp.,* 277 U.S. 323, 334 (1928) ("The respondent, having brought itself

within the [restraint of princes] exception under its bill of lading, the burden is on the

petitioners to show that respondents' negligence was the cause of or contributed to the

loss."); *M&Z Trading Corp.* at 144; *Lekas & Drivas* at 430; *M.O.H. of West Indies, Inc.,* at

13-14.

At the outset, the undersigned rejects the contention of the Plaintiffs, (DE # 222 at

27), that the restraint of princes doctrine is confined to situations where the entire harbor

is closed by government forces; on the contrary, as stated above, the doctrine applies

even where a single ship is detained by governmental authorities.  It is clear that the

delay in the case at bar was due to the restraint on departure imposed by the Venezuelan

authorities.   Therefore, the restraint of princes exception is applicable.

Carib-Bahamas cannot, however, avail itself of this exception from liability since

the evidence establishes that the restraint by the foreign government was the result of its

own misconduct.[24]  As stated above, paragraph 19 of the Asbatankvoy form that sets

---

[24]  The Defendants did not argue that, if the Court found they were illegally attempting to
export diesel, that they would be able to avail themselves of the restraint of princes
provision of the contract.  In closing argument, defense counsel did not expressly
concede this, but only claimed that if this were the case, the Plaintiffs were still required
to prove the damages sustained as a result of the detention, and that the Plaintiffs had
failed to do so (DE # 222 at 32-33).  Contrary to the Defendants' assertion, in its findings

forth the restraint of princes exception from liability, does not apply where the charterer is at fault in causing the governmental detention.  In the case at bar, the actions of Carib-Bahamas in knowingly attempting to export diesel without the proper permit, which caused the detention by the Venezuelan government, bar its reliance on paragraph 19.[25] Moreover, any claim that the Plaintiff failed to mitigate its damages by failing to act promptly to secure the release of the vessel is belied by the evidence, as previously stated.

3.  Eitzen A/S and Eitzen Singapore, as the prevailing parties, are entitled to recover their attorneys' fees and costs from defendant Carib-Bahamas, pursuant to the express provisions of Clause 23 of the Asbatankvoy form made a part of the charter party.

4.  Carib-Bahamas and Carib-Florida are separate entities; Plaintiffs have failed to prove that Carib-Florida should be held liable under the charter party as the alter ego of Carib-Bahamas.

The issue presented is whether Carib-Florida can be held liable for the breach of a contract entered into by Carib-Bahamas.  The precise legal theory under which the Plaintiff seeks to hold Carib-Florida is unclear.  The main focus of the Plaintiff's argument has been that Carib-Florida, rather than Carib-Bahamas was the contracting party.  This factual argument has been rejected as set forth in the findings of fact.  It also appears, however, that the Plaintiff may be claiming that Carib-Florida is the alter ego of Carib-Bahamas and the corporate veil of Carib-Florida should be pierced so that it is

---

of fact, the undersigned found that Plaintiffs had proven the majority of their claimed damages.

[25]  This result makes it unnecessary to parse out which of the claimed damages are the result of the detention, and which of the claimed damages arise solely from the terms of the contract, e.g. unpaid freight and dockage charges.  Neither of the parties expressly listed damages that would nevertheless be due if the restraint of princes doctrine applied.

liable for any judgment entered against Carib-Bahamas based upon the breach of the GLEN and SICHEM CHALLENGE charter parties by Carib-Bahamas.  Although the thrust of veil-piercing claim made by the Plaintiff appears to relate to the liability of Carlos Gamboa, in an abundance of caution, the undersigned addresses the alter ego/veil piercing claim with respect to Carib-Florida as well.

As stated above, since this is an admiralty action, federal common law applies.  At the outset, the undersigned notes that this is not a case where the two corporate parties have a parent-subsidiary relationship; rather, they are sister corporations with common ownership.  In addition, this case is a contract case rather than a tort case, and the existence of alter ego liability is governed by the standards applicable to contract cases.

In *United States v. Jon-T Chemicals*, 768 F.2d 686, 692-94 (5th Cir. 1985), the Court examined the determination of alter ego liability in the context of a claim by the United States to recover damages based on fraudulent misrepresentations and conversion.[26] The Court first listed the following twelve factors that should be examined to make this determination:

(1) the parent and the subsidiary have common stock ownership;

(2) the parent and the subsidiary have common directors or officers;

(3) the parent and the subsidiary have common business departments;

 (4) the parent and the subsidiary file consolidated financial statements and tax returns;

(5) the parent finances the subsidiary;

(6) the parent caused the incorporation of the subsidiary;

(7) the subsidiary operates with grossly inadequate capital;

(8) the parent pays the salaries and other expenses of the subsidiary;

---

[26]  The Court noted that it was not necessary to determine whether federal law or Texas law applied since the two were the same. 768 F.2d at 690 n.6.  *Accord Exter Shipping, Ltd. v. Kilackos*, 310 F. Supp2d 1301, 1317 (N.D. Ga. 2004) (finding Georgia and federal admiralty law used same factors to determine alter ego liability).

**(9) the subsidiary receives no business except that given to it by the parent;**

**(10) the parent uses the subsidiary's property as its own;**

**(11) the daily operations of the two corporations are not kept separate; and**

**(12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.**

768 F.2d at 691-92.[27]  *Accord Northern Tankers (Cyprus) Ltd. v. Backstrom,* 967 F. Supp. 1391 (D. Conn. 1997) (applying the above factors to maritime claim).

The Court recognized, however, that in contract cases, unlike tort cases, "fraud is an essential element of an alter ego finding….In a contract case, the creditor has willingly transacted business with the subsidiary.  If the creditor wants to be able to hold the parent liable for the subsidiary's debts, it can contract for this.  Unless the subsidiary misrepresents its financial condition to the creditor, the creditor should be bound by its decision to deal with the subsidiary; it should not be able to complain later that the subsidiary is unsound." *Jon-T Chemicals*, 68 F.2d at 692-93.

As determined in the above factual findings, the entity that contracted with the Plaintiffs, through Southport, is Carib-Bahamas.  The finding that Carib-Bahamas is the entity that was a party to the charter agreements at issue in this case is buttressed by the fact that Southport had engaged in business with Carib-Bahamas prior to the incorporation of Carib-Florida, and Southport assumed it was dealing with the same entity with respect to the SICHEM CHALLENGE charter.  Therefore, Carib-Bahamas is the

---

[27] Some courts have recognized that the same factors can be employed to determine alter ego liability between sister corporations.  *See, e.g. Dickson Marine Inc. v. Panalpina, Inc.,* 179 F.3d 331, 338-39 (5th Cir. 1999).  Other courts have rejected veil piercing claims against sister corporations.  *See, e.g. Madison County Communications Dist. V. Centurylink, Inc.,* No. CV 12-J-1768-NE, 2012 WL 6685672 at *4 (N.D. Ala. Dec. 20, 2012) (citing cases).  The undersigned finds more persuasive the rationale that permits the corporate veil of a sister corporation to be pierced if the requisite showing can be made, although this showing will likely be more difficult in the case of a sister corporation.

only entity that is directly liable for any damages that occurred in connection with the charters of the GLEN and the SICHEM CHALLENGE.  Carib-Florida was not a party to the charters; and, is a distinct corporate entity that is not jointly liable with respect to the contracts of Carib-Bahamas.

With respect to any alter ego claim, there is a lack of evidence in the record with respect to many of the twelve Jon-T Chemicals factors.  Although the two companies shared a common address in Florida, had common ownership, and Carib-Florida was used by Carib-Bahamas to handle financial transactions, and the entities maintained their separate corporate existence, and Carib-Bahamas used its attorney's office in the Bahamas as well as its office in Florida.  Carlos Gamboa caused the incorporation of both Carib-Florida and Carib-Bahamas, but there is no evidence regarding common business departments or whether they file consolidated financial statements or tax returns.  It appears that all of the funds of Carib-Florida are derived from business activities of Carib-Bahamas.  There is no evidence regarding whether Carib-Bahamas uses the property of Carib-Florida as its own, or vice versa, or whether the business records and daily operations of the two companies are kept separate.  It appears that Carib-Florida has its own bank account.  Significantly, however, there is no evidence that Carib-Bahamas used Carib-Florida for fraudulent purposes or to avoid its liabilities. There similarly is no evidence that Carib-Florida engaged in any fraudulent transactions itself.  It is not sufficient to pierce the corporate veil that the two companies had common ownership, or that the function of Carib-Florida was to handle financial transactions for Carib-Bahamas.  Citing *Talen's Landing, Inc. v. M/V Venture* II, 656 F.2d 57, 1160 (5th Cir. 1981), the Plaintiff argues that "where the controlling entity of one corporation siphons off the assets of that corporation into another controlled corporation in order to place the assets of a siphoned corporation beyond the reach of legitimate creditors, justice and equity" demand that the corporate veil be pierced with respect to those assets."  (DE #

38

205 at 38).  Although that is a correct statement of the law, in the case at bar, unlike *Talen's Landing,* there is no evidence that Carib-Bahamas has sought to defraud creditors by funneling money to Carib-Florida, at least not yet.[28]

On these facts, and in the absence of fraud in connection with the use of the corporate form, the undersigned concludes that Plaintiffs have failed to prove that Carib-Florida is the alter ego of Carib-Bahamas, and therefore Carib-Florida cannot be held liable for a breach of contract by Carib-Bahamas.

5.  The Plaintiffs have failed to prove that the corporate veil of Carib-Bahamas should be pierced to hold Carlos Gamboa individually liable for the alleged breach of contract by Carib-Bahamas.

The Plaintiffs seek to hold Carlos Gamboa individually liable on the theory that the corporate veil of Carib-Bahamas should be pierced.  The twelve factors listed above are also relevant to this determination.  In sum, there will be individual liability where a corporation is set up or used as a subterfuge, where the individual owner does not observe the corporate form, where there are no employees or bank accounts, and where personal and corporate funds are merged.  *See, e.g., Claybar v. Huffman*, 54 F. Supp. 3d 1284, 1289 (S.D. Ala. 2014).[29]  As stated by the Eleventh Circuit in *Molinos Valle Del*

---

[28]   This determination, of course, does not affect any future claim based on fraudulent transfer of assets that may be made if Carib-Bahamas does not satisfy the judgment entered against it in this case; or collection by writ of garnishment for funds of Carib-Bahamas that may be held by Carib-Florida.

[29]   In addition, an individual officer of a corporation may be held liable where the officer personally participates in tortious conduct which is the subject of the lawsuit.  *See, e.g., Xtec, Inc. v. Cardsmart Tech., Inc.,* No. 11-22866-CIV-Rosenbaum, 2014 WL 10268426 at *6 (S.D. Fla. May 15, 2014);  *Int'l Schools Serv., Inc. v. AAUG Ins. Co. Ltd.*, No. 10-62115-CIV, 2012 WL 5192265 (S.D. Fla. July 25, 2012).  The Plaintiffs in the case at bar, however, have not brought tort claims, but have brought claims for breach of contract.  Therefore, they cannot obtain relief from the individual defendant on this theory.

*Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011), construing Florida law,[30] in order to hold a shareholder individually liable, a plaintiff must establish that the corporate form was used fraudulently or for an improper purpose that caused injury to the Plaintiff.  Examples of improper conduct are using the corporation as a subterfuge to mislead or defraud creditors, hide assets, or there is some betrayal of trust.  *Eckhardt v. United States*, 463 F. App'x 852, 856 (11th Cir. 2012).

In the case at bar, although the facts established that Carlos Gamboa dominated and controlled Carib-Bahamas, there is insufficient evidence to prove that Carib-Bahamas used its corporate form for a fraudulent purpose;  that it failed to keep books and records; or that the corporate form was not observed.  Although the Plaintiffs point to the improper and/or fraudulent conduct of Gamboa in misrepresenting the cargo and attempting to smuggle it out of Venezuela, "the law requires that the fraud or injustice [necessary for personal liability] occur as a result of the inequitable use of the corporate form itself as a sham, and not from the underlying claim."  *Marnavi S.P.A. v. Keehan*, 900 F. Supp. 2d 377, 392 (D. Del. 2012).  *Accord North American Clearing, Inc. v. Brokerage Computer Systems, Inc.*, 666 F. Supp. 2d 1299, 1307-08 (M.D. Fla. 2009) (even causing corporation to intentionally breach a contract or commit conversion does not justify piercing corporate veil where conduct did not involve improper use of corporate form).

The undersigned recognizes that there is some evidence to support the Plaintiff's position—the business conducted by Carib-Bahamas was operated from the residence of Carlos Gamboa, and money earned by Carib-Bahamas was held in accounts by Carib-Florida, which in turn was apparently used in part to pay some personal expenses of Carlos Gamboa.  There is no showing, however, how these payments were made, and whether they were part of the salary earned by Carlos Gamboa, or distributions of profits.

---

[30] There does not appear to be a difference between Florida law and federal common law regarding veil piercing claims.

There was insufficient analysis of the financial/bank records of Carlos Gamboa, Carib-Bahamas and Carib-Florida to establish a co-mingling of funds or that the corporate form was not observed.  Even though Carib-Bahamas had no employees, it conducted business through independent contractors who served the same function.  Although Carib-Bahamas and Carib-Florida operated out of the same space, which at one time was the residence of Carlos Gamboa, Carib-Bahamas also operated out of its attorney's office in the Bahamas.  The mere fact that Carlos Gamboa controlled all of the operations of Carib-Bahamas is insufficient to ignore the corporate fiction and pierce the corporate veil.  Carib-Bahamas was a functioning company engaged in business, as confirmed by Southport, prior to both the GLEN and SICHEM CHALLENGE charters.  The evidence does not establish that Carlos Gamboa failed to observe the corporate formalities in conducting the business of Carib-Bahamas, or that he treated the funds of Carib-Bahamas as his own.  There is no evidence that the use of the corporate form by Carlos Gamboa was for the purpose of misleading or defrauding the Plaintiff or other creditors.  Although the Court has found that the transaction involving the SICHEM CHALLENGE was an attempt to smuggle diesel out of Venezuela without the proper permit, the evidence established that it did not matter to the Plaintiff whether the cargo was a solvent /degreaser, or diesel, since the vessel was capable of transporting either.  Plaintiff appears to argue that if a corporation's breach of contract is caused by fraudulent activities on the part of a corporation's officer, then the officer becomes liable for the breach of contract.  If, as contended by the Plaintiff, the law permitted the imposition of liability on controlling corporate shareholders for breach of contract, as opposed to commission of a tort, caused by their misconduct, then Carlos Gamboa might be liable for the damages under the contract.  The law, however, requires misuse of the corporate form rather than misconduct by the officer/shareholder.  If the Plaintiff

wanted to hold Carlos Gamboa personally liable for damages under the contract, the Plaintiff could have contracted for his liability.

Although at first blush, this result might seem unfair based upon Gamboa's involvement in the smuggling scheme, but the law provides a remedy for tortious conduct committed by a corporate officer or shareholder—there is personal liability for such conduct, but the individual must be sued for the tortious conduct rather than for breach of the corporation's contract.  In this regard, the undersigned notes that the Plaintiffs sought leave to file a third amended complaint to add fraud counts against Carlos Gamboa, (DE # 73), but the predecessor judge assigned to this case denied leave to amend as untimely (DE # 77).

In sum, under the circumstances in the case at bar, Carlos Gamboa is not personally liable for the breach of contract, and is entitled to judgment in his favor.

IV.    **CONCLUSION**

Based upon the foregoing findings of fact and conclusions of law, it is hereby

ORDERED AND ADJUDGED that as to Count 1 of the Complaint, judgment is entered in favor of Plaintiff Eitzen A/S in the amount of $10,659.72, plus reasonable attorneys' fees and costs, and against defendant Carib Petroleum, a Bahamian corporation; and judgment is entered in favor of Carib Petroleum, Inc. a Florida corporation against Plaintiff Eitzen A/S.  It is further

ORDERED AND ADJUDGED that, as to Count 2 of the Complaint, judgment is entered in favor Plaintiff Eitzen Chemical (Singapore) PTE, Ltd. against defendant Carib Petroleum, a Bahamian corporation, in the amount of $891,984.74, plus reasonable attorneys' fees and costs; and judgment is entered against Plaintiff Eitzen Chemical (Singapore) PTE, Ltd, and in favor of defendant Carib Petroleum, a Florida corporation.  It is further

**ORDERED AND ADJUDGED** that, as to Count 3 of the Complaint, judgment is entered in favor of Defendant Carlos Gamboa, and against Plaintiffs Eitzen A/S and Eitzen Chemical (Singapore) PTE, Ltd.

The Court reserves jurisdiction to determine the amount of attorney's fees and costs, in accordance with the provisions of S.D. FL. Local Rule 7.3.  This case is closed and all pending motions are denied as moot.

**DONE AND ORDERED** in chambers in Miami, Florida, this 29th day of December, 2016.

_Andrea M. Simonton_
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

**Copies furnished via CM/ECF to:**
**All counsel of record**